SOUTHERN IRON & COAL COMPANY *v.* F. R. SCHWOON
*et al.*

(*Nashville.* December Term, 1910.)

1. ADVERSE POSSESSION. Period of suspension of statutes of limitations from May 6, 1861, to January 1, 1867, could not be used to complete bar of statutes of limitations.

The adverse possession of land from 1860 to 1870 did not complete the bar of the statute, because the period from May 6, 1861, to January 1, 1867, was inoperative, and could not be used to complete the bar of the statute of limitation of seven years, and such adverse possession was reduced to a period of less than seven years, under Acts 1865, ch. 10, sec. 1, suspending the operation of the statutes of limitations from May 6, 1861, to January 1, 1867. (*Post, p.* 196.)

Acts cited and construed: Acts 1865, ch. 10, sec. 1.

2. SAME. Assurance of title purporting to convey an estate in fee constitutes color of title.

An assurance of title purporting to convey an estate in fee, though not, in fact, conveying such estate, constitutes color of title; and it may be a fraudulent or forged deed, or it may be a will, or a decree divesting and vesting title, or any other paper purporting to transfer a title in fee. (*Post, pp.* 203, 204.)

Code cited and construed: Sec. 4456 (S.); sec. 3459 (M. & V.); sec. 2763 (T. & S. and 1858).

Acts cited and construed: Acts 1819, ch. 28, sec. 1.

3. SAME. Same. Decree in ejectment adjudging the title to be in complainant is not an assurance of title, when.

A decree in an ejectment suit, which merely declares that the complainant therein is the owner in fee of the land in controversy described, and that his title is superior to that claimed

by the defendant therein, but which does not purport to divest and vest title, is not an assurance of title; for· such decree simply determines, · in favor of the complainant, the con·test with the defendant, and merely means that the.court has considered the complainant's chain of title, and adjudges that he has title, but does not purport to transfer title. (*Post, pp.* 194, 195, 203-205.)

Code cited and construed: Sec. 6301 (S.); sec. 5234 (M. & V.); sec. 4484 (T. & S. and 1858).

Case cited and approved: Duncan v. Gibbs, 1 Yerg., 258.

Case cited and distinguished: Wilkins v. McCorkle, 112 Tenn., 688.

4. SAME. Deed of bargain and sale quitclaiming and transferring land constitutes color of title, and not a mere quitclaim deed.

A deed which uses the expression "bargained and sold, and do hereby quitclaim and transfer" purports to convey the lands, and is not a mere quitclaim deed, but is a color of title. (*Post, pp.* 193, 194, 201-203, 205.)

Case cited and approved: Hanks v. Folsom, 11 Lea, 559.

5. SAME. Executor's deed conveying "all the right, title, and claim" of testator holding under registered tax deeds purporting to convey the fee is an assurance of title.

The deed of an executor, showing on its face that it is made in pursuance of a power conferred by the will, and purporting to convey "all the right, title, and claim" of the testator who held under registered tax deeds purporting to convey an estate in fee, is an assurance of title within the meaning of the statute of limitation (Shannon's Code, sec. 4456) vesting title in one who has had seven years' adverse possession of land under an assurance of title. (*Post, pp.* 193, 194, 197, 198, 200, 203,´205-207.)

Cases cited and approved: McGavock v. Deery, 1 Cold., 265; Seifreid v. State, 2 Tenn. Chy., 17, 23; Thurston v. University, 4 Lea, 513, 515-520; Swiney v. Swiney, 14 Lea, 316, 323.

124 Tenn.—12

6. **SAME.   Void tax deed is an assurance of title.**

If it be conceded that a tax deed is void on the ground that the land was assessed for the taxes against a deceased owner, or on the ground that the tax sale was made on a day not authorized by law, still it would constitute an assurance of title within the meaning of the statute of limitations.   (*Post, pp.* 193, 195, 196, 207, 208.)

Cases cited and approved:   Gray v. Darby, M. & Y., 396; Love v. Shields, 3 Yerg., 405; Whiteside v. Singleton, Meigs, 224; Vance v. Johnson, 10 Humph., 214; Blantire v. Whitaker, 11 Humph., 313; Clark v. Chase, 5 Sneed, 636; Hunter v. O'Neal, 4 Bax., 494.

7. **SAME.   Deed purporting to convey right and title of grantor holding under deeds purporting to convey the fee is an assurance of title.**

A deed purporting to convey the grantor's right, title, and interest in a specified tract of land, accompanied by proof of deeds purporting to convey an estate in fee to him, constitutes an assurance of title or color of title.   (*Post, p.* 208.)

8. **SAME.   Deed conveying grantor's right, title, estate, and interest in certain described lands constitutes an assurance of title within our statutes of limitations.**

Under the statute (Shannon's Code, sec 3672), providing that every grant or devise of real estate, or any interest therein, shall pass all the estate or interest of the grantor or devisor, unless the intent to pass a less estate or interest shall appear, one who makes a deed conveying all its right, title, estate, and interest in certain described lands, or who uses equivalent words, necessarily refers to his title papers, and the deed conveys whatever interest those title papers show that he has; and where his title papers do not convey a title to him in fact and law, but only purport to do so, the effect would be the same, that is, the deed would carry whatever force or effect such assurance has under our statutes of limitations.   (*Post, pp.* 208, 209.)

Iron & Coal Co. v. Schwoon.

Code cited and construed: Sec. 3672 (S.); sec. 2812 (M. & V.); sec. 2006 (T. & S. and 1858).

Acts cited and construed: Acts 1819, ch. 28, sec. 1; Acts 1851-52, ch. 33, sec. 1.

9. **DEEDS OF CONVEYANCE. Conveying all that portion not previously conveyed or held by older title, without description of excluded land, operates prima facie to convey the whole described tract.**

Where a deed purports to convey "all that portion not heretofore sold or conveyed or held by older title of" a certain described tract, all lands previously conveyed and those held by older title are excluded; and the rule is that the burden of establishing the existence and location of the excluded land is on the party claiming adversely to the deed; and, unless a description of the excluded land appears in the deed, there is *prima facie* no excluded territory until the evidence establishes the fact. (*Post, pp.* 193, 197-201, 209, 210.)

Cases cited and approved: Bowman v. Bowman, 3 Head, 48; Fowler v. Nixon, 7 Heisk., 719; Bleidorn v. Pilot Mountain C. & M. Co., 89 Tenn., 212; Wright v. Hurst, 122 Tenn., 656.

10. **SAME. Intention reached by construction of all parts, without regard to technical divisions.**

All parts of a deed shall be examined together for the purpose of reaching the intention of the parties, and, when so ascertained, that intention shall control, without regard to technical divisions, or to the particular parts of deeds as distinguished from each other. (*Post, p.* 210.)

Cases cited and approved: Kirk v. Burkholtz, 3 Tenn., Chy., 421, 424, et seq; Hanks v. Folsom, 11 Lea, 560 (and citations); Fogarty v. Stack, 2 Pickle, 610.

11. **SAME. Rule stated in the ninth headnote has become a rule of property.**

The rule stated in the ninth headnote has become a rule of prop erty in this State and the distinction contended for that such

rule may obtain as to lands granted in a deed and then excluded, but not where the exclusion appears in the granting words of the deed, would be disastrous. (*Post, p.* 210.)

12. ADVERSE POSSESSION. The cutting of timber, not shown to be the only use the land was susceptible of, does not consitute adverse possession.

Where the evidence shows that the defendant for more than seven years, cut timber on the land in controversy, but the evidence does not show that the land was susceptible of only that form of occupation or use, but on the contrary shows, by the subsequent building of houses and the clearing and opening of fields thereon, that it was susceptible of other forms of possession, there was no adverse possession established. (*Post, pp.* 211, 212.)

Cases cited and approved: West v. Lanier, 9 Humph., 762; Creech v. Jones, 5 Sneed, 632; Cass v. Richardson, 2 Cold., 28; Copeland v. Murphy, 2 Cold., 72; Pullen v. Hopkins, 1 Lea, 741; Hicks v. Tredericks, 9 Lea, 491; Coal & Iron Co. v. Coppinger, 95 Tenn., 526.

13. SAME. Same. Not made out by defendant's cutting of timber, though bill charged land was valuable principally for its timber, but not stating that it was exclusively valuable therefor.

A charge in the bill that the land sought to be recovered was valuable principally for it timber, but not stating that it was exclusively valuable therefor, does not enable the defendant to make out adverse possession by showing that he cut timber on the land for more than seven years. (*Post, pp.* 211, 212.)

14. SAME. Lime kilns not used continuously for seven years and houses burned within four or five years after their erection, and not rebuilt, do not constitute adverse possession.

Where a lime kiln was erected on land and used for the burn- of lime for some years, but not continuously for seven years, but remained thereon in good condition for seven years; and about the time the kiln was constructed, some houses were

Iron & Coal Co. v. Schwoon.

built for the lime burners, but these were destroyed by fire four or five years thereafter, and were never rebuilt, adverse possession for seven years is not shown under our seven year statute of limitation. (*Post*, *p*. 212.)

Code cited and construed: Sec. 4456 (S.); sec 3459 (M. & V.); sec. 2763 (T. & S. and 1858).

Acts cited and construed: Acts 1819, ch. 28, 1.

15. SAME. Inclosure and cultivation of land for two years, then the erection of houses thereon and their occupancy for five years, though the fences are removed, constitute adverse possession.

Where lands were inclosed and cultivated for two years, and then houses were erected within the inclosures, and thereafter the fence around the inclosure was torn down to faciliate the logging business of the possessor, and the occupancy of the houses were continuously kept up until such possession had been held consecutively for more than seven years before the bill was filed, the adverse possession of the defendant was established. (*Post*, *p*. 213.)

16. SAME. Possession acquired by one holding under a registered deed from one without color of title, and held adversely for seven years perfects his title.

Where the owner of a tract of land occupied an adjoining parcel included in another tract embraced in a deed under which a third person claimed, until he sold his tract to such third person, who then took possession thereof and also of such parcel, and continued in such possession of such parcel for more than seven years under his previously registered deed, which enabled any adverse claimant to determine the nature of the claim of such third person's possession, the third person's possession ripened into a title by adverse possession, over the objection that there was but a secret change of possession from one who had no color of title to one who had color of title, without bringing knowledge of the changed possession to the adverse claimant;

Iron & Coal Co. v. Schwoon.

for the inclosure and possession were notorious, and the adverse claim was shown by the registered deed under which the possession was held. (*Post*, *pp.* 213-216.)

Code cited and construed: Sec. 4456 (S.); sec. 3459 (M. & V.); sec. 2763 (T. & S. and 1858).

Acts cited and construed: Acts 1819, ch. 28, sec. 1; Acts 1895, ch. 38.

Cases cited and approved: Coal Co. v. Parks, 94 Tenn., 263; Coal Co. v. Scott, 121 Tenn., 88, 118, 119, 120.

17. **SAME. Statute of limitation need not be pleaded where title has been perfected by adverse possession under registered deed.**

The defendant need not plead the seven year statute of limitation in order to make his defense under the statute (Shannon's Code, sec. 4456), vesting title in one who has had seven years' adverse possession holding under a registered assurance of title, since seven years' adverse possession thereunder operates as a transfer of title. (*Post*, *p.* 216.)

Code cited and construed: Sec. 4456 (S.); sec. 3459 (M. & V.); sec. 2763 (T. & S. and 1858).

Acts cited and construed: Acts 1819, ch. 28, sec. 1.

18. **SAME. Statute of limitation must be pleaded to make defense of possessory right.**

Where the defense is merely of a possessory right under Acts 1819, ch. 28, sec. 2 (embraced in Shannon's Code, sec. 4458), the defense of the seven year statute of limitation must be pleaded, in order to make the defense. (*Post*, *p.* 216.)

---

### FROM GRUNDY.

---

Appeal from the Chancery Court of Grundy County. —T. M. McCONNELL, Chancellor.

WHITSON & MERCER, for complainant.

J. D. FULTS, J. B. FERGUSON, and L. V. WOODLEE, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

Complainant's bill was filed on January 16, 1907. It claimed thereunder a tract of land described, containing about 2,500 acres lying within grant No. 4,935, issued by the State of Tennessee to one Samuel Edmondson, dated January 6, 1837; that complainant had become the owner of this land by virtue of a regular chain of conveyances from the grantee to itself.

It was alleged that this land was wild mountain land, including the gulf or gulches of Big creek, or Rain's creek, and also of the Stone Door, and had on it a large quantity of valuable poplar, oak, and other timber; that it was especially valuable for its timber, which was worth many thousands of dollars; that the land denuded of its timber would not be worth more than ordinary mountain land, and much of it would be worthless.

The bill further alleges:

"That complainant is informed and believes that defendant F. R. Schwoon is claiming the ownership of and setting up some kind of claim of title to a portion or all of said tract of land. That complainant is informed and believes that defendant Schwoon is claiming said land under a quitclaim deed for which he paid only the sum

of seventy-five dollars; that said claim of title rests solely on a tax sale made in 1859 or 1860 to one W. C. Hill. That complainant is informed and believes and is advised that said tax sale was and is invalid, null, and void and conferred no title on the purchaser, and that defendant Schwoon acquired no title by said purchase, and has not acquired the title since; that defendant Schwoon has unlawfully and without authority entered upon said land and erected a house thereon, and has cut and destroyed several hundred dollars worth of fine poplar timber thereon, as complainant is informed, and has committed divers trespasses and waste on said land and will continue to do so unless restrained; that defendant Schwoon, as complainant is informed and believes, is now and has been for several years engaged more or less in the sawmill and lumber business; that he now has a sawmill near said premises; that it is his avowed intention to cut and remove the timber from said land; and that he will so cut and remove said timber unless restrained by the fiat of your honor's court."

It is further alleged that Charles E. Campbell is claiming ownership of all of said tract of land, by virtue of (a conveyance of) one McMurray, of the land described in grant No. 5318, covered and issued to one Stephen Haight; that said Haight's title is inferior to that of complainant.

Defendant Schwoon answered in the following language:

"Respondent denies each and every material allegation in said bill contained as fully and as emphatically as though each of said allegations was herein quoted *verbatim* and each separately denied in express terms. Respondent most especially denies that the complainant company is the owner of the land described in said bill or any part of same, either legally or equitably."

Defendant Campbell filed an answer in the same terms.

The cause was heard by Chancellor McConnell at the November term, 1908, and he then entered a decree adjudging that the allegations of the bill have been fully met and denied by the answers, and were not sustained by the evidence, and he thereupon dismissed the bill.

From this decree the complainant prayed an appeal to this court, which was granted, and errors have been assigned. The cause was argued at a previous term and held under advisement by the court until the present term, and has been again argued, and we now have it before us for determination.

As already stated, complainant claims title under a grant issued to one Samuel Edmondson on January 6, 1837. It appears from the evidence that there were two Samuel Edmondsons living in Warren county at the time the grant was issued, one Dr. Samuel Edmondson and another Samuel Edmondson, a hotel keeper. Complainant insists that the grant was issued to Dr. Samuel Edmondson. Defendant insists that it was issued to Samuel Edmondson, the hotel keeper, who was a cousin

of Dr. Samuel Edmondson. The evidence as to the identity of the grantee is quite meager on both sides.

Passing this controversy at this time, and assuming for the present that Dr. Samuel Edmondson was the grantee, it should be stated that he died intestate in 1844, leaving as his only heir at law John Crawford Edmondson. On the 25th of April, 1887, John Crawford Edmonson, along with W. W. Summers and wife, C. R. Summers, and Ward Kincannon and Mrs. C. G. Kincannon, entered into a contract whereby they agreed to sell to P. W. Keith and John H. Anderson the tract of land in controversy. This contract recites:

"Whereas, the said John C. Edmondson is the owner of one-half of the following lands; and as W. W. Summers, C. R. Summers, his wife, Ward Kincannon and Mrs. C. G. Kincannon are the owners of the other one-half undivided interest in the following described grants, viz., Nos. 4,669; 4,933; 4,394; 4,935; 4,936; 4,937, 4,938; 4,939; 4,940; 4,972; 4,973; 4,987; 5,051; 5,052; 5,191; 6,174; 6,175, of record in the register's office for the Mountain Land district at Sparta, Tennessee, to which reference is here made for a full and more specific description; and

"Whereas, said lands are of that class of lands known as 'wild lands,' and that it is necessary to investigate the title to some, to locate said lands:

"Now, therefore, the said P. W. Keith and John H. Anderson bind and obligate themselves to locate said lands, and to find purchasers to purchase the same,

using all good diligence to secure purchasers therefor, and, if necessary to make sales, will map said lands and carry purchasers on the same to show the same up to the best advantage; all of which is to be at the expense of the said Keith and Anderson.

"Now, therefore, and in consideration of one dollar to us in hand paid, and the said services rendered by the said P. W. Keith and John H. Anderson, and by them hereby agreed to be rendered, we bind ourselves, our heirs and assigns, to pay over to the said P. W. Keith and John H. Anderson, their heirs and assigns, one-third part of the sales price of said lands when sold. The said Anderson and Keith obligate themselves to submit all offers of purchase to our consideration for our acceptance and confirmation; said land not to be sold for less than one dollar per acre. And to this end said P. W. Keith and John H. Anderson are hereby empowered and authorized to make sales of any and all of said lands as early as is practicable; and to this end we, John C. Edmondson, W. W. Summers, C. R. Summers, Ward Kincannon and C. G. Kincannon, bind and obligate ourselves to make, or cause to be made, the purchasers solicited by said Keith and Anderson good and sufficient title to any and all said land, after having the terms of sale submitted to us as aforesaid."

John C. Edmondson, the son, died in October, 1887, testate. In his last will and testament he made these provisions:

"Second. I will and bequeath to my beloved wife, M.

L. Edmondson, all my property, both real and personal, during her natural life to be used by her as she wishes.

"Third. I will and bequeath all my property not consumed in use heretofore left to my wife during her life, upon her death to my beloved niece, Mrs. Rowena Smartt and her two children Myra Smartt and. Geo. E. Smartt, sharing equally; and if any other children shall hereafter be born to Mrs. Rowena Smartt they shall take an equal share in said property.

"Fourth. I will and direct that J. P. Smartt and wife, Rowena Smartt, shall be authorized to manage and control the property of said minors during their minority for their benefit. During the minority of said children aforesaid, I authorize my wife, M. L. Edmondson, J. P. Smartt and Mrs. Rowena Smartt, or in case of death of either one of them, the survivors, to sell and dispose and make title to any real estate of which I may die seized and possessed, when in their judgment they think best to do so.

"Fifth. I hereby nominate and appoint J. P. Smartt as the executor of this, my last will and testament, relieving him from giving any bond as such."

On the 3d day of April, 1890, Edmondson, Kincannon, and others sold said lands, including grant No. 4,935, to the Cumberland Mountain Coal, Iron & Railroad Company; and said Cumberland Mountain Coal, Iron & Railroad Company sold said lands to the Bridgeport Land & Improvement Company, a corporation organized under the laws of the State of Alabama; and by request of

said Anderson and Keith and the Cumberland Mountain Coal, Iron & Railroad Company a deed was made conveying said property directly to the Bridgeport Land & Improvement Company for the consideration of the sum of $20,000, a receipt of which was acknowledged.

This deed recites:

"We, the said C. G. Kincannon, C. R. Summers, Ward Kincannon and J. P. Smartt, executor, and jointly with M. P. Edmondson, widow of said testator, and Rowena Smartt, wife of the said J. P. Smartt (by virtue of the power conferred upon them by the will aforesaid), have bargained and sold, and hereby quitclaim and convey to the Bridgeport Land & Improvement Company their respective and undivided one-half interest in and to the lands embraced in the following grants, to wit: Nos. 4,969; 4,933; 4,934; 4,935; 4,936; 4,937; 4,938; 4,939; 4,940; 4,972; 4,973; 4,987; 5,051; 5,052; 5,191; 6,174; and 6,175; all being of record in the register's office for the Mountain Land district at Sparta, Tennessee, to which reference is had for a full and more specific description. Said lands lie in Grundy, Coffee and adjoining counties, as will more particularly appear from the record of said grants, it being the intention to convey all the lands jointly owned by either.

"To have and to hold to the said Bridgeport Land & Improvement Company, its successors and assigns forever.

"We covenant and bind ourselves, our heirs and representatives, to warrant and defend the title to the one-

half interest in said land conveyed by us respectively to said company, its successors and assigns forever against any claims to be made by ourselves, our heirs, executors, administrators, but no further."

The next link in the chain of title consists of a record in the case of R. H. McFarland, a citizen of the State of Alabama, against the Bridgeport Land & Improvement Company.

This was a bill filed by said McFarland on July 1, 1903, in the chancery court of Coffee county, Tenn., against the Bridgeport Land & Improvement Company, for the purpose of collecting certain judgments he had obtained against the Bridgeport Land & Improvement Company in Alabama. The bill was afterwards amended, so as to make it a general creditors' bill, to wind up the affairs of the Bridgeport Land & Improvement Company, and to sell its assets for the payment of its debts. This bill set out and described the lands embraced in the grants hereinbefore mentioned, including grant No. 4,935; and such proceedings were had in this case in the chancery court of Coffee county that these lands were decreed to be sold by the chancery court, and were sold by the clerk and master at public outcry, and were purchased by the Southern Coal, Iron & Railroad Company, the complainant in this cause, for the sum of $45,000, and the title to all of said property divested out of the Bridgeport Land & Improvement Company, and vested in the Southern Coal, Iron & Railroad Company by decree of the court, and the clerk and master was or-

dered to execute and convey said lands by deed, to be re-corded as a muniment of title.

In pursuance of this decree, sale, and purchase by the Southern Coal & Iron Company, the clerk and master of the chancery court of Coffee county executed a deed con-veying to said Southern Coal & Iron Company all the lands above mentioned, including grant No. 4,935, which it had recorded as its muniment of title.

Defendant insists that this chain of title is fatally defective, because the complainant has failed to show that Dr. Samuel Edmondson was the grantee of grant No. 4,935. Secondly, because the Bridgeport Land & Improvement Company was a foreign corporation, if a corporation at all, a citizen of Alabama, having no legal *status* in Tennessee, and the general creditors' bill filed in the chancery court of Coffee county was between citi-zens of Alabama. Third, because the charter of the Bridgeport Land & Improvement Company is not filed in this record, and, it being a foreign corporation, it was incumbent upon the complainant to file said charter as a link in its chain of title. Fourth, that, if the paper title of the complainant were otherwise perfect, it would cover but a one-half undivided interest in the lands in controversy, there being no conveyance or other muni-ment of title vesting the Summers and Kincannons with the half interest they attempt to convey, and the Ed-mondsons purport to convey but a half interest.

It is next insisted that, if complainant's title were otherwise perfect, it is inferior to the title of defendant

Schwoon, because he has been in absolute, open, notorious, and adverse possession, under a deed of conveyance purporting to convey a fee, ever since 1882, by cutting, selling, sawing, and using the timber from said lands; this being the character of possession such lands are susceptible of.

It is next insisted that, if such possession by cutting timber for twenty-five years next before the filing of the bill in this cause be held insufficient to vest him with title, yet for more than seven years next before the filing of the bill he has had, under said deed and color of title, open, notorious, and adverse possession of said lands by houses, outbuildings, fences, and inclosures.

It is next insisted that if said deed purporting to convey a fee, and under which he has owned and controlled said land, were deemed insufficient as color of title, he has another assurance of title to said property, a decree of the chancery court of Grundy county, entered at the November term, 1899, more than seven years before the filing of the bill in this case.

Defendant Schwoon introduced the following documents:

First. A deed executed November 25, 1861, by Samuel Christian, tax collector, to W. C. Hill. This instrument recites judgment rendered by the circuit court of Grundy county, on January 7, 1860, for $11.48 for four tracts of land, one of which is referred to and reputed to be owned by Samuel Edmondson, and describes the tract in controversy. This deed recites that the judgment and

order of sale came into the collector's hands on January 30, 1860; that, after advertising and giving notice, he sold the several tracts of land separately at the court-house door, on the first Monday in July, 1860, at public sale, to William C. Hill, for $11.48.

Second. A deed executed December 19, 1861, by John Dugan, tax collector, to William C. Hill, transferring nine tracts of land. Among the lands described is that in controversy in this case. This deed recites that the judgment and order of sale came to the hands of the sureties of the tax collector of Grundy county for the year 1858; that the lands were sold at the courthouse on the 3d day of December, 1860. The bid for this tract was $12.25.

Third. William C. Hill died testate. In his will Francis Marion Moffett was made executor. The will contains this clause: "I direct that whilst executor he shall sell any of my personal real estate, little or large, at public or private sale, for cash, or on time as he may think best."

Fourth. A deed which purports to be a deed of F. M. Moffett to defendant Schwoon. This document is as follows: "I, F. M. Moffett, as executor of William C. Hill, deceased, by virtue of the authority in me vested as said executor, for and in consideration of seventy-five dollars to me in hand paid, receipt of which is hereby acknowledged, have this day bargained and sold, and do hereby quitclaim and transfer to F. R. Schwoon, his heirs and assigns forever, all the right, title and claim

that I, as said executor, have in and to all that portion
not heretofore sold or conveyed or held by older title to
the following described 5000 acres tract of land in
Grundy county"—describing the land in controversy.

Fifth.   A decree made at the November term, 1899, of
the chancery court at Altamont, in the cause of
*Frederick Schwoon* v. *T. B. Roddy et al.*   This decree,
so far as is necessary to recite its contents, is as follows:

"This cause came on to be heard on the 23d day of No-
vember, 1899, before the Honorable T. M. McConnell,
the chancellor, upon the bill of complainant and ex-
hibits thereto, the answers of the several defendants, and
the proof filed in this cause; from all of which it appears
to the court that complainant Frederick Schwoon, Sr.,
is the owner in fee simple of the following described
tract of land (describing the land in controversy in the
present case,) situated in 'Grundy county, Tenn.   It
further appears to the court that on June 7, 1897, the
defendant T. B. Roddy, as agent for defendant David
Mason, filed a suit in replevin before J. R. Myers, a jus-
tice of the peace of Grundy county, Tenn., to recover the
possession of a certain valuable walnut tree which had
been cut from said tract of land under a claim of said
Mason as owner of the lands upon which said timber
was cut; said replevin suit having been enjoined by the
bill in this cause.   It further appears to the court that
the title of the said David Mason to said tract of land
above described, or to any part thereof, is inferior to the
title of defendant Frederick Schwoon, Sr., and is a cloud

upon the same, and, as such, should be removed.  It is therefore considered by the court, and so ordered and decreed, that the complainant Frederick Schwoon have and recover from the defendant the above-described tract of land, and that the claim of title of said defendants, or either of them, to said lands, or any part thereof, is a cloud upon the title of complainant, and as such is declared void, invalid, and removed."

Complainant attacks the deed made by Christian, the tax collector, to Hill, dated November 25, 1861, and the deed from Dugan, dated December 2, 1861, alleging that both of these deeds were void, because the taxes for 1858 and 1859, to collect which the sales were had under which said deeds were executed, were assessed against Samuel Edmondson, and judgment rendered against Samuel Edmondson for said taxes.  It is said that Samuel Edmondson was not the owner of the property in 1858 and 1859, and therefore was not the party to be assessed or sued, as he died in 1844, which was fourteen years before the taxes in question were assessed, and fifteen years before any judgment was rendered.  It is insisted that John C. Edmondson was the owner of the property in 1858 and 1859, as the heir of Dr. Samuel Edmondson.  This objection, it is perceived, is based upon the assumption that grant No. 4,935 was issued to Dr. Samuel Edmondson, and not to Samuel Edmondson the hotel keeper.

It is insisted also that the tax sale made by Dugan is void for the further reason that the sale was had on De-

cember 3d, instead of on the first Monday of July, as required under the statute existing at that time.

It is noted, also, that on the trial of the cause in the court below the complainant excepted to the reading as evidence of the deed which purported to have been executed by Christian to Hill, and the deed purported to have been executed by John Dugan to W. C. Hill, exhibits Nos. 1 and 2, respectively, to the deposition of defendant Schwoon, because not supported by the record of the cases respectively upon which they were based. These exceptions were overruled by the chancellor on the ground that the deed might be read as evidence of color of title only, and for this purpose need not be supported by the record.

William C. Hill held adverse possession of this land, under his tax deeds, which purported to convey an estate in fee, through the tenant Andrew Fults, from 1860 to 1870; but through the operation of the act of May 30, 1865, ch. 10, section 1, the time from May 6, 1861, to January 1, 1867, was inoperative, and could not be used to complete the bar of the statute of limitations, so that such adverse possession through Fults was legally reduced to a period of less than seven years.

It is insisted by complainant that these tax deeds, for the reason stated, conferred no title on William C. Hill, Moffett's testator; and that Moffett, as the executor of W. C. Hill's will, although authorized by the will to sell and convey his lands, could impart no title to Schwoon, inasmuch as Hill had no property therein.

It is then insisted that, in order to present any kind of defense to complainant's bill, Schwoon must make out a case of adverse possession under the statute of limitations, holding by a recorded deed purporting to convey a fee.

It is averred in complainant's brief that the chancellor, in rendering his decree in this case in the court below, held that the defendant Schwoon had perfected his title to the tract of land in controversy by the statute of limitations of seven years, holding by recorded color of title purporting to convey a fee and thereupon dismissed complainant's bill, taxing it with the cost. This is assigned for error.

It is insisted in behalf of complainant that the deed presented in evidence by the defendant Schwoon purporting to have been executed by F. M. Moffett, as executor of the estate of William C. Hill, in and of itself is not a color of title to any tract of land, in that it does not describe any specific tract.

This objection is based on the words "all of the right, title, and claim that I as said executor have in and to all that portion not heretofore sold or conveyed or held by older title." It is said that this deed does not purport to convey the 5,000-acre tract, but only the interest in that part of it which had not theretofore been sold or conveyed or held by older title; that, while the description given is of a very large tract of land, 5,000 acres, and might be good if it purported to convey the whole tract, yet, inasmuch as it failed totally to describe where

the portion conveyed was located, it was too indefinite and uncertain.

It is further said that this is a conveyance where the exception is embraced in the conveying part of the deed; that the meaning of it is all of the tract except that part heretofore sold or conveyed or held by older title. In other words, that the lands embraced in the exception are not conveyed by this deed, but only that part of the lands lying outside of the lands theretofore sold or conveyed or held by older title, and that the burden was on Schwoon to identify the land which he claimed under this deed, as some specific tract of land inclosed within some specific boundary, and that he could not do this without first showing what land had been previously sold or conveyed or held by older title.

In response to this the defendant insists that, if such exclusion were made in a grant, the party relying on the exclusion would have to show affirmatively the boundaries of the land excluded. In other words, that the burden of proof would be on the party relying on the exclusion, as, without any definite description in the grant, such exclusions are ineffective, until they are made definite by proof.

It is insisted on behalf of defendant that the same rule applies to deeds; but that, admitting for the sake of argument that the burden of identifying the exclusions in the deed from Moffett to Schwoon was upon the defendant, it is insisted by him that the record shows conclusively all that portion of grant No. 4,935 theretofore

sold or conveyed or held by older title. Reference is made to exhibit No. 11 to the deposition of Frederick Schwoon, which is a deed from James H. Hughes of McMinnville, and William C. Hill of Altamont to the Swiss Emigration Society or Mutual Trust Company of Emigration of the State of Berne, conveying the one-fourth of 30,000 acres of land in Grundy county, Tenn., to be selected by said societies by taking every fourth alternate lot, and no other, which consist of fifty and one hundred acre lots hereafter to be laid off.

It is perceived at transcript page 700 the first tract described as the land of William C. Hill is the land in question, grant No. 4,935. On pages 701 and 702 of the transcript appear the conditions upon which the deed was to become operative. It is conceded by defendant that these conditions were not complied with, and the deed became null and void; but it is insisted that Moffett, the executor of William C. Hill, could not be charged with notice of the fact. The deed was dated June 24, 1868, and it is insisted that this is one of the exclusions referred to by Moffett as land heretofore sold or conveyed. On page 690 of the transcript, filed as exhibit No. 7 to the deposition of defendant Schwoon is the deed of William C. Hill to Andrew Fults for two hundred acres, dated April 22, 1870. It is insisted that this is the other tract referred to by Moffett as land theretofore sold or conveyed. It is further insisted by defendant that these deeds are specific, and the boundaries of the tract and the numbers of the lots are clearly

shown. Again, complainant refers to exhibit No. 10 to his deposition, which exhibit is grant No. 3,250 issued by the State of Tennessee to Moses Thompson, October 30, 1828, an older grant than the Edmondson, and the evidence shows that grant No. 4,935 laps on a portion of grant No. 3,250. An interlock was therefore held by older title at the time of the issuance of grant No. 4,935, and also at the time Moffett executed the deed to Schwoon, and it is insisted it was therefore excluded from the deed.

It is insisted that these are the only prior conveyances, and answers to the language in the deed as the lands "heretofore sold or conveyed or held by older title," and that, if the burden was on defendant Schwoon, he has affirmatively shown what lands were excluded.

It is insisted, however, in behalf of the complainant, that inasmuch as grant No. 4,935 was issued to Dr. Samuel Edmonson, this must likewise fall within the clause with respect to older titles excluded. This hardly seems to fall within the rule, because if that grant was really issued to Dr. Samuel Edmonson, instead of to the hotel keeper, Samuel Edmonson, it completely covered the land in controversy, and the question would not be one of exclusion at all, but simply of superior title.

Complainant lays special stress upon the following words in the Moffett deed: "All the right, title, and claim that I, as said executor, have in and to all that portion not heretofore sold or held by older titles," etc. It is said that this deed purports to convey only the right, title, and claim that Moffett as executor had in and to

the land in controversy; that it does not purport to convey even the testator's interest in the land; that the will of W .C. Hill does not devise this land to F. M. Moffett to sell, but only vests him with the power to make a sale; and hence that he had no interest in the land whatever; and so, having no interest in the land at the date he executed the deed to Schwoon, he could convey no interest in the land to Schwoon.

In response to this it is said by defendant that Moffett's deed starts out with the language, "I, F. M. Moffett, executor of William C. Hill, deceased, by virtue of the authority in me vested as said executor," and then, after the words of conveyance, "all the right, title and claim that I as said executor have in and to all that portion not theretofore sold," etc. In other words, it is said that the deed shows that he was acting in his official capacity under the will of William C. Hill, which gave him the authority to sell this or any land belonging to Hill, at the time of his death; that Moffett was acting within the scope of his authority; and that he was transferring, not his interest, but the interest that he as said executor had.

Again, it is insisted by complainant that the Moffett deed is a mere quitclaim deed, and purports to convey nothing, or, if it purports to convey anything at all, at most it could only be whatever interest W. C. Hill had, and it does not appear that he had any interest in the land. On this head complainants say:

"We are not making the contention that a quitclaim

deed is no color of title. It may be that a quitclaim deed which purports to convey the land itself, and not a mere interest in the land, is color of title that purports to convey a fee under the statute of limitations, and will vest true title. But our contention is that the description here used to describe the interest in the land conveyed is a limitation on the estate conveyed. 'All my right, title and claim' is the language of the deed. It does not purport to convey anything that could not be embraced within these terms. What then is the meaning of this language, 'All my right, title and claim'? Necessarily, that means all of the interest, the legal or equitable interest, the conveyor had in the land at the time; and, if he had no interest in the land, he could convey none; and, if he had no right, title, or legal claim to the land, he could convey none. Therefore the description contained in this deed, being a limitation on the estate conveyed, confines it to the interest of, or the title owned by, the conveyor; and, if he had no interest or title, he could convey none, because the deed would not be a color of title for any purpose. So that we insist, in order to show that the deed made by Moffett pretended to convey this land to Schwoon in order to be a color of title for any interest in the land, it is incumbent upon the defendant to show that Moffett or his testator Hill had some legal or equitable interest in the land at the time to convey."

In behalf of defendant it is insisted that the expression "quitclaim" is only one of four words used in the conveying part of this deed, to wit, "bargained and sold,

and do hereby quitclaim and transfer. So that," continues defendant, "this is not a mere quitclaim deed, but a regular deed of conveyance, purporting to convey a fee. . . . The deed from Moffett to Schwoon does more than quitclaim. It bargains, sells, quitclaims and transfers by metes and bounds the lands in controversy."

We do not find in defendant's brief any attempt to answer the argument above quoted from the complainant's brief respecting the conveyance of an interest merely. However, defendant insists that the deed from Moffett is not the only muniment of title under which Schwoon claims the land in controversy, but he also claims it under the decree above referred to, made in the case of Frederick Schwoon against T. B. Roddy, which was made more than seven years before the bill was filed.

The complainant makes many controversies with the defendant, as we have seen, but is silent upon the subject of the decree last referred to, as a muniment of title as the basis for the transference of title under the statute of limitations.

We should have been glad to have the benefit of a discussion of this subject by the respective counsel, as the question seems to be one of first impression in this State, so far as our investigations have extended. However, it is not difficult when tested by established principles.

The fundamental thought underlying an assurance of title is that it must be a paper which purports to convey an estate in fee. In order to be mere color of title it need not, in fact, convey such estate, and if it be what is

called mere color of title, it never does, but always purports to convey. It may be a fraudulent deed or a forged deed, or it may be a will or a decree divesting and vesting title, or any other paper that purports to transfer, a fee title. This fundamental requirement appears in our act of 1819 as its contents are set forth in section 4456 of Shannon's Code. The language used is: "Holding by conveyance, devise, grant, or other assurance of title purporting to convey an estate in fee." This rule is general. It is said in Cyc., vol. 1, p. 1055 *et seq.*, that an instrument in order to operate as a color of title "must purport to convey title to the claimant thereunder, or to those with whom he is in privity." The decree above referred to merely declares that the complainant therein is the owner in fee of the land described, and that his title is superior to that claimed by the defendant therein, but it does not purport to divest and vest title. We are referred by counsel for defendant to the case of *Wilkins* v. *McCorkle,* 112 Tenn., 688, 80 S. W., 834, as supporting the proposition that a decree divesting and vesting title is equivalent to a deed. So it is in fact, and it is so declared by our statute. Shannon's Code, section 6301. And such was the rule at common law, as noted in the case of *Duncan* v. *Gibbs,* 1 Yerg., 258, loc. cit. But it is no where held, so far as we know, that a decree in an ejectment suit merely declaring that the complainant therein is the owner in fee of the land for the purpose of determining the contest with the defendant in such case is an assurance of title. Such a decree means simply that the court has considered the plaintiff's chain of title,

and adjudges that he has title. It does not purport to transfer title.

We shall now consider whether the Moffett deed can be treated as showing color of title.

We are of opinion that it can and should be. The objection is not well taken that the executor purports to convey his own interest. The deed shows that he is undertaking to act pursuant to a power conferred upon him as executor of the will of W. C. Hill, and to convey the interest of Hill's estate.

Equally unfounded is the contention that the deed is a mere quitclaim. It uses the expressions, "bargained and sold" and "transfer." These are sufficient (*Hanks* v. *Folsom*, 11 Lea, 559), even the latter, to purport a conveyance.

The point made on the expressions, "all the right, title and claim," presents more difficulty. However, when this is taken in connection with the will of W. C. Hill, and the tax deeds made to Hill, the difficulty vanishes. Each of these deeds purports to convey an estate in fee. That these deeds must be taken in connection with the will and Moffett's deed is manifest, since the executor expressly referred to the will, and, in purporting to convey the interest of his testator, necessarily referred to his title papers, both of which were duly registered in the county at the time his deed was made. Such reference was sufficient to describe the property and the interest conveyed. *McGavock* v. *Deery,* 1 Cold., 265; *Seifried*

v. *State*, 2 Tenn. Ch., 17, and 23; *Swiney* v. *Swiney*, 14 Lea, 316, 323.

A striking example of the principle is found in *Thurston* v. *University of North Carolina*. In that case it appeared that Samuel Dickens died in 1840, leaving a will which was admitted to probate in September of that year. By that will, after making certain specific devises and legacies, he directed all the residue of his lands and real estate "to be equally divided between his children," and appointed three persons by name to make "all and every necessary division pursuant to the will," and provided that "their acts and doings, or the acts and doings of either two of them," should be binding on all parties concerned. In pursuance of the will the parties themselves agreed upon a division of the lands in writing, by which the 640-acre tract of land in controversy in that case, treated as part of the estate of Samuel Dickens, was allotted to one of his daughters, Mrs. Belote. The partition thus made was acknowledged by the two commissioners as having been made under the powers conferred by the will. Mrs. Belote went immediately into possession of the land, and held it for more than ten years. Subsequently the University of North Carolina, to which this land, along with other land, had been granted by the State of Tennessee, set up claim to the land. The heirs of Dickens, of whom Mrs. Belote was one, claimed that there had been a deed made to Dickens by the University which had been lost, but were unable to prove it, and so Mrs. Belote was compelled to rely upon seven years' ad-

verse possession.  The court, after referring to the well-
known principle that a decree of a competent court for
partition is an assurance of title, within the meaning of
the statute of limitations, for the reason that the parties
hold their parcels in severalty by the same title that they
held in common, said that a deed or agreement for parti-
tion voluntarily entered into by the parties would be
equally efficacious for the same reason, although it did
not in legal terms vest each partitioner with the fee. The
court then stated that the question for decision was
whether the partition of specific lands among  the  de-
visees made under a will which gave each devisee a fee in
lands devised, constituted an assurance of title under
the statute to the lands mentioned therein, although the
testator had, in fact, no title, or, at most, a mere posses-
sory title to the land.  In disposing of it, the court said
that the land was beyond doubt supposed by the devisees
and the persons empowered by the will to make the par-
tition to belong to the testator; that whether it did in
fact belong to him by any assurance of title could not
now be shown; that the instrument of ·partition  was
neither forged nor fraudulent; that "even if inoperative
in its inception, or founded on a will ineffective as to
the lands in controversy, when taken in connection with
the will it purported to convey an estate in fee." *Thurs-
ton* v. *University of North Carolina,* 4 Lea, 513, 515-520.

If it be conceded that the tax deeds were void on the
grounds insisted on by complainant, which have been
already referred to, they would constitute an assurance

of title notwithstanding.  *Love* v. *Shields,* 3 Yerg., 405;
*Vance* v. *Johnson,* 10 Humph., 214; *Hunter* v. *O'Neal,* 4
Baxt., 494; *Whiteside* v. *Singleton,* Meigs. 224; *Gray* v.
*Darby,* Mart. &. Y., 396; *Clark* v. *Chase,* 5 Sneed, 636;
*Blantire* v. *Whitaker,* 11 Humph., 313.

It may be that a deed made by A. B. purporting to con-
vey all of his right, title, and interest   to   a   specified
boundary of land, nothing else appearing, would not be
an assurance of title; but, if accompanied by proof of
deeds purporting to convey an estate in fee to him, the
two taken together would constitute an assurance of ti-
tle sufficient under our act of 1819, when supported by
seven years' adverse possession, to effect the transfer of
title.   It is true that such a deed would not in and of it-
self convey title of A. B. had no title; but, united with
proof of a deed purporting to convey title,   it   would
amount to color of title.   In this same connection should
be considered our Act of 1851-52, ch. 33 section 1, the
contents of which appear in Shannon's Code, section
3672.   This act provides that "every grant or devise of
real estate, or any interest therein, shall pass all the es-
tate or interest of the grantor or devisor, unless the in-
tent to pass a less estate, or interest, shall appear by ex-
press terms, or be necessarily implied in the terms of the
instrument."   Under this statute, when one makes a
deed to "all my right, title, estate, and interest" in cer-
tain lands, or uses equivalent words, he necessarily re-
fers to his title papers, and the deed conveys whatever
interest those title papers show that he has; or in case

his title papers do not really convey a title to him in fact and law, but only purport to convey such title, the effect would be the same; that is, the deed would carry whatever force or effect such assurance has under our statute of limitations, that is, section 1 of our Act of 1819, ch. 28.

We shall next consider the point made upon the following language contained in the Moffett deed, viz.: "All that portion not heretofore sold or conveyed or held by older title of the following described 5,000-acre tract of land," etc. This is equivalent to a clause excluding from the conveyance lands previously conveyed, and those held by older title. The rule upon that subject is laid down in this State in the cases of *Bowman* v. *Bowman*, 3 Head, 48, *Fowler* v. *Nixon*, 7 Heisk., 719; *Bleidorn* v. *Pilot Mountain C. & M. Co.*, 89 Tenn., 212, 15 S. W., 737; and *Wright* v. *Hurst*, 122 Tenn., 656, 127 S. W., 701, 135 Am. St. Rep., 869, and it is that the burdens of establishing the existence and location of the excluded land is upon the party claiming adversely to the deed; that, unless a description of the excluded land appears in the face of the deed, there is *prima facie* no excluded territory until the testimony establishes that there is some particular land referred to in the excluding clause covered by a prior conveyance; that, when this fact is established by evidence, then as to such particular territory the grant or deed never did operate as a conveyance or color of title to such excluded territory.

124 Tenn.—14

It is insisted by complainants that, while this may be the rule as to lands granted in a deed and then excluded, it cannot be the rule where the exclusion appears in the granting words of the deed. The modern rule, as recognized in this State, is that all the parts of a deed shall be examined together for the purpose of reaching the intention, and, when so ascertained, that intention shall control without regard to technical divisions, or to the particular parts of deeds as distinguished from each other. *Hanks* v. *Folsom*, 11 Lea, 560, loc. cit., and authorities cited; *Fogarty* v. *Stack*, 2 Pick., 610, 8 S. W., 846. See also, *Kirk* v. *Burkholtz*, 3 Tenn. Ch., 421, 424, *et seq.*

The rule laid down in *Bowman* v. *Bowman*, and other cases cited in connection therewith, has become a rule of property in this State, and the consequences of indulging the technical distinction made in complainant's brief just referred to in respect of the particular part of a deed in which the excluding clause must appear might be disastrous. The cases cited, *Bowman* v. *Bowman* and others therewith, refer to exclusion clauses generally, and the doctrine upon that subject is firmly established in this State.

Moreover, the defendant, though not bound to furnish such evidence, has shown the particular tracts or parcels of land to which the exclusion clauses refer; the deed of Hill to Andrew Fults for two hundred acres, and the Thompson grant, No. 3,250. The deed to the Swiss Emigration Society is of no importance upon this subject.

We shall next consider the question whether defendant has made out his claim of seven years' adverse possession under the color of title above discussed.

Six possessions are referred to in the evidence.

We exclude possessions Nos. 3, 5, and 6 as having been made within seven years next before the filing of the bill.

Before referring especially to Nos. 1, 2, and 4, we should dispose of a claim put forward, rather tentatively, it is true, in the brief, that defendant Schwoon had perfected an adverse possession upon the land by cutting timber. All the testimony to be found upon this subject is in his deposition, as follows: "I have exercised acts of ownership over the tract in controversy for twenty-five years, and cut timber to a great extent, having had a sawmill on the tract of Mr. McCarver and cut timber up from the lands in controversy to the amount of a million feet of poplar. I cut walnut timber as far back as 1883, and have cut most every year more or less timber on the land in controversy." So far as concerns the cutting of timber, the evidence is not sufficient to justify the conclusion that defendant thereby perfected an adverse possession, because it does not appear that the land was susceptible of only that form of occupation. Indeed, it is shown by the evidence of subsequent possessions, in building houses and inclosing fields, that it was susceptible of other forms of possession than that of cutting timber. It is true that the bill charges that the land was valuable principally for its timber, but it is not said

that it was exclusively valuable therefor. We have several cases in this State bearing upon this phase of the subject, viz.: *West* v. *Lanier,* 9 Humph., 762; *Creech* v. *Jones,* 5 Sneed, 632; *Cass* v. *Richardson,* 2 Cold., 28; *Copeland* v. *Murphy,* 2 Cold., 72; *Pullen* v. *Hopkins,* 1 Lea, 741; *Hicks* v. *Tredericks,* 9 Lea. 491; *Coal & Iron Co.* v. *Coppinger,* 95 Tenn., 526, 32 S. W., 465. Some of the earlier cases indicate a more liberal doctrine upon this subject than the later ones. These latter have shown a disposition not to extend the right of acquiring possession by acts of cutting timber, and, particularly, it is shown in *Hicks* v. *Tredericks* that where the claimant has subsequently built houses, or opened fields upon the property, he thereby conclusively admits that it was capable of other possession than that of cutting timber.

Possession No. 1 consists of a lime kiln. This was erected upon the land in 1899, and used for the burning of lime for some years. About the same time that the kiln was constructed, there were some houses built for the lime burners. These houses, however, were destroyed by fire four or five years thereafter, and were never rebuilt. It appears that the lime kiln is now in good condition, but it does not appear that it was used continuously for seven years. We are of the opinion that the fact that a lime kiln is left in good condition standing upon a tract of land would not constitute such possession as would hold the land within the sense of our statute of limitations, the act of 1819 above referred to. What effect such structure would have if continuously used for seven consecutive years we need

Iron & Coal Co. v. Schwoon.

not determine, as the facts in this case do not present such a question.

Possession No. 2 rests on the following facts: In 1899 defendant Schwoon inclosed an acre or an acre and a half of land lying on the northeastern part of the tract in controversy, and this land was cultivated by tenants who lived in a nearby house during the years 1899 and 1900, and in 1901 two houses and a stable were constructed upon this lot, within the inclosure, and they have been used and kept up ever since. After the houses were built, the fence around the inclosure was torn down in order to facilitate the logging business of defendant Schwoon, because the space occupied by the fence was needed to haul logs over. However, as stated, the houses were occupied, and they were continuously kept up. Although no one is living in the houses now, defendant keeps some of his property in two of them. This possession had been held consecutively more than seven years when the bill in the present case was filed. We are of the opinion that this establishes respondent's defense of seven years' adverse possession. Although the fence was removed, as already stated, before it was removed the houses were built, as stated, within the inclosure, and they were kept up thereafter.

Possession No. 4 is known as the "turkey bottom" field.

This consists of two acres, and was taken possession of by defendant on February 13, 1899, and has been held by him under an inclosure and adversely ever since, and

of course, nothing else appearing, is a legal possession which would perfect his title; it having been held by him more than seven years before the bill was filed.

It is insisted, however, by complainant that this is not the true result, because of the following facts: Prior to February 13, 1899, one Elias McCarver owned a small tract of land which lay over and upon the Edmondson grant. This McCarver tract consisted of less than a hundred acres, and was a part of grant No. 3,250, the Thompson grant, which was superior to the Edmondson grant. McCarver, while he was living upon this Thompson land, cleared the "turkey bottom" field, believing at the time that it was within the Thompson grant. He rested under this impression until two or three years prior to February 13th, when he discovered by a survey made that it was outside of his grant; that is, of the Thompson grant. Still, he continued to use and cultivate that field. On February 13, 1899, he sold the Thompson land to the defendant Schwoon. Schwoon took possession of the Thompson land, and at the same time took possession of the "turkey bottom" field, and during that year had the fences reset, and had a crop made on this land in 1899 and 1900, and has kept it up ever since. On one occasion, a part of the fence was laid down to let his log wagons through, but was rebuilt.

Now, it is insisted by complainant that inasmuch as McCarver held possession of the "turkey bottom" field without any color of title, and that Schwoon took possession of that field at the same time that he took posses-

sion of the land he bought from McCarver, this was a se-
cret change of possession from one who had no color of
title to one who did have, and that the statute of limita-
tions would not run in favor of the latter unless knowl-
edge of the changed possession was brought to the owner
of the Dr. Samuel Edmondson title. As authority for
this proposition, we are referred to *Johnson & Burr* v.
*Elder,* 92 Ark., 30, 121 S. W., 1068.

We do not think this is a sound view. The case rather
falls under the authority of *Coal Co.* v. *Scott,* 121 Tenn.,
88, 118, 119, 120 (loc. cit.), 114 S. W., 930, and *Bon Air
Coal Co.* v. *Parks,* 94 Tenn., 263, 29 S. W., 130. At the
time defendant took possession of the "turkey bottom"
field, he knew that it lay outside of the Thompson grant,
and his possession must have been based upon his claim
under the Moffett deed. So far as concerns the knowl-
edge of whoever may have been the true owner of the Ed-
mondson grant, the fence around the field was notice to
such owner, and the fact that Schwoon was in posses-
sion, was notorious, and the fact that he had a claim to
the land must have been equally known, because the
Moffett deed under which he claimed was registered;
also, the will of W. C. Hill and the deeds under which
Hill claimed. By the Act of 1895, ch. 38, such registra-
tion is required as a condition of the vestiture of title;
the Act of 1819, ch. 28, section 1, being amended to that
extent. The purpose of requiring such registrations was
to enable landowners to determine the nature of the
claim which any possessor might be making to his land.

In view of this statute, and the registered deeds above referred to, it could not be said that this was a secret transfer of possession of which the owner of the Edmondson grant could not be required to take notice.

Neither of the two possessions above referred to were upon excluded lands, but were upon other parts of the Edmondson tract.

It was not necessary that defendant should have pleaded the statute of limitations in order to make his defense under the first section of the act of 1819, since seven years adverse possession under that act operates as a transfer of title; the adverse possessor tolls the title of the real owner; the rule is otherwise where the defense is merely of a possessory right under the second section of the act of 1819. These principles are so well settled that it is unnecessary to cite authorities to support them.

Up to this time we have preferred to merely assume that the evidence was sufficient to show that Dr. Samuel Edmondson was the grantee under grant No. 4,935, instead of the hotel keeper Samuel Edmondson, in order that we might consider, on their merits, the leading questions of law presented. We have carefully examined the testimony upon this question, but do not deem it necessary to decide it, as such decisions, now unimportant to the present controversy, might affect other litigations concerning other grants, which may be pending, or may arise hereafter.

There are some other questions suggested in the briefs

Iron & Coal Co. v. Schwoon.

of counsel, as already indicated, but they need not be considered, as those already disposed of are determinative of the issues.

It results that the decree of the chancellor must be affirmed, with costs.