# SUPREME COURT OF TENNESSEE

### FOR THE

### MIDDLE DIVISION

---

### NASHVILLE, DECEMBER TERM, 1922.

---

*(Continued from vol. 147.)*

---

SHERMAN G. SAGE *et al. v.* DAYTON COAL & IRON CO. *et al.*

*(Nashville.* December Term, 1922.)

1. **EVIDENCE.** Rule as to custody of ancient deed to render it admissible in evidence stated.

  The general rule is that a private deed over thirty years old may be admitted in evidence without proof of its execution, if it be taken from the proper custody, though it is not necessary that it come from the best custody. *(Post, pp. 5-8.)*

  Cases cited and distinguished: Woods v. Bonner, 89 Tenn., 418; Doe v. Pearce, 2 Mo. & Rob., 240; Gibson v. Poor, 21 N. H., 446; Bishop of Meath v. Marquis of Winchester, 2 Bing., 183.

2. **EVIDENCE.** Evidence held to establish deed was more than thirty years old.

  Evidence of its appearance and the acknowledgment of a deed *held*

sufficient to establish that it was more than thirty years old. (*Post, pp.* 8-11.)

Case cited and distinguished: Perry v. Clift, 54 S. W., 121.

3. **PUBLIC LANDS.** Statute relating to early entry of land held not to require personal appearance.

Acts 1823, chapter 49, section 7, providing that "persons wishing to make an entry in any of the land offices shall produce to the entry taker at the time of making the same a location, etc., . . . " *held* not to require that the person making the entry personally appear for that purpose. (*Post, pp.* 11-13.)

Acts cited and construed: Acts 1823, ch. 49, sec. 7.

4. **EVIDENCE.** Ancient deed held not to come from proper custody to render it admissible in evidence.

Evidence *held* insufficient to show a deed in the proper custody and render it admissible in evidence without proof of execution. (*Post, pp.* 12-16.)

5. **STIPULATIONS.** Stipulation as to nonavailability of particular possession to establish title by adverse possession held to preclude subsequent claim.

A stipulation in an action, wherein it was sought to establish title to land by adverse possession, that possession on a particular tract of land was not available to defendants in support of their claim, *held* to preclude their subsequent claim that such possession was in fact on the land involved and not on the land covered by the stipulation and therefore available to them. (*Post, pp.* 16, 17.)

6. **ADVERSE POSSESSION.** Evidence held insufficient to establish title.

Evidence of the use of a small lot of land as a cow pen for salting purposes, and possession by another under whom defendants claimed, *held* insufficient to establish title by adverse possession. (*Post, p.* 17.)

---

FROM BLOUNT.

---

Sage v. Dayton Coal & Iron Co.

Appeal from the Chancery Court of Blount County.— HON. T. L. STEWART, Chancellor.

S. L. ROBINSON and LEWIS S. POPE, for appellants.

J. B. SWAFFORD and FOSTER V. BROWN, for appellees.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

This is an ejectment suit instituted by the heirs at law of James R. Sage to recover a five thousand-acre tract of land located in Bledsoe county, Tenn.

This tract of land was granted by the State of Tennessee to James R. Sage by grant No. 2752, dated November 19, 1832, and duly recorded in the Mountain District.

James R. Sage died intestate in 1839. It is claimed by the complainants that he owned said tract of land at the time of his death, and that they, as his heirs, are the present owners thereof.

The defendants contend that the grantee, James R. Sage, conveyed said tract of land to Ephriam P. Shannon by deed dated April 27, 1833. This alleged deed was written on the back of the original grant No. 2752, and is as follows:

"Know all men by these presents: That we, James R. Sage and Adah, his wife, of the township of Plymouth, Luzerne county, and State of Pennsylvania, for and in consideration of the sum of twelve hundred and fifty dollars to us in hand paid by E. P. Shannon, of the county of Northumberland, in the State aforesaid, the receipt of which is hereby acknowledged, have assigned, transferred and set over and by these presents do assign, trans-

fer and set over all of our right, title, interest, claim and demand whatsoever to the within described tract of land unto E. P. Shannon and his heirs and assigns forever.

"Witness our hands and seals this the 27th day of April in the year of our Lord one thousand eight hundred and thirty-three.

"JAMES R. SAGE. [Seal.]

"ADAH SAGE.          [Seal.]

"Signed, sealed and delivered in presence of H. B. Wright, P. McGilchrist."

"State of Pennsylvania, Luzerne County.

"Be it remembered on the 27th day of April, 1833, before me, the subscriber, one of the judges of the court of common pleas of said county, personally came the above-named James R. Sage and Adah, his wife, and acknowledged the above instrument to be their act and deed and desired the same might be recorded as such. The said Adah being of full age and by me examined separate and apart from her husband, declared that she executed the same voluntarily of her own free will and accord without the coercion or compulsion of her said husband, the full contents thereof being by me made known to her.

"WM. S. ROSS. [Seal.]"

The foregoing deed was never recorded, and it is conceded that the acknowledgment is defective, and that it was not subject to registration for that reason.

Said deed was offered in evidence on the trial of this cause by the defendants, and was excepted to by the complainants on several grounds; the first being that there is no evidence that said deed is more than thirty years of age, and that it was found in the proper custody so as to make it admissible in evidence as an ancient document.

The general rule, as to admitting ancient documents in evidence, is contained in the following authorities:

In *Woods* v. *Bonner,* 89 Tenn., 418, 18 S. W., 67, this court said: "The general rule is that a private deed over thirty years old . . . may be admitted in evidence without proof of its execution; that, being an ancient document, its due execution is presumed; and the subscribing witnesses, though in fact living and present, need not be called to establish the fact—provided the instrument be found in the proper custody, and is free from suspicion as to its genuineness. . . . Learned counsel for complainants insist, and it has frequently been held, that accompanying possession under the deed must also be shown before it can be admitted in evidence as an ancient instrument without proof as to its execution; but this view is contrary to the weight of authority, and cannot be sustained on principle."

In 22 Corpus Juris, section 1180, it is said:

"The mere antiquity of an instrument is not alone sufficient to warrant its admission in evidence, but it must also appear that the instrument comes from the proper custody or depository, it being considered that the careful preservation of an instrument by persons interested in the subject-matter raises an inference of genuineness, which does not arise where the instrument is in the custody of strangers. Documents are said to be in proper custody where they are in the place in which, and under the care of the person with whom, they would naturally be, but no one custody will be deemed a necessary one, nor can any custody be said to be improper if it is proved to have had a legitimate origin, or if the circumstances of the particular case are such as to render such an origin prob-

able. Accordingly, the custody to be shown for the purpose of making a document evidence without proof of execution is not necessarily that of the person strictly entitled to the possession. It is enough if the person in whose custody the document is found is so connected with the document that he may reasonably be supposed to be in possession of it without fraud. If an ancient document is produced from the proper custody, as for instance if it is found among the family papers of the persons entitled thereto, or in the hands of a trustee of an estate, of an heir or the wife of the grantee, or of an agent or attorney of the parties beneficially interested it is admissible; and in such cases it is not necessary to account for its custody during the entire period of its existence. But a deed which has been in the possession of the grantor ever since its alleged execution is not admissible under the ancient document rule. The purpose of showing custody of the instrument is to afford to the judge a reasonable assurance of its authenticity, and whether a document comes from a proper custody is a question for the court and not for the jury."

In Wigmore on Evidence, vol. 3, sections 2139 and 2140, it is said:

"The document, at the time of its original discovery, must have been in some place where it would be natural to find a genuine document of such a tenor as the one in question. A forger can usually not secure the placing of the document in such a custody; and hence, the naturalness of its custody, being relevant circumstantially (ante, sections 148, 157) is required in combination with the document's age."

Lord COLERIDGE, in *Doe* v. *Pearce*, 2 Mo. & Rob., 240, said: "It is not necessary that the custody from which an

ancient document comes should be strictly according to the legal rights; it is enough if it be brought from a place of deposit where in the ordinary course of things such a document, if genuine, might reasonably be expected to be found."

In *Gibson* v. *Poor*, 21 N. H., 446, 53 Am. Dec., 216, Judge EAST said:

"The reason why it is required that an ancient document shall be produced from the proper depository is, that thereby credit is given to its genuineness. Were it not for its antiquity and the presumption that consequently arises that evidence of its execution cannot be obtained, it would have to be proved. It is not that any one particular place of deposit can have more virtue in it than another, or make that true which is false; but the fact of its coming from the natural and proper place, tends to remove presumptions of fraud, and strengthens the belief of its genuineness. It may be false, and so shown, notwithstanding the presumptions in its favor. If found where it would not properly and naturally be, its absence from the proper place must be satisfactorily accounted for; but that being done and all suspicions against its genuineness removed, we can discover no reason why it may not be read in evidence. The real question which is to affect its consideration . . . is, whether the instrument offered is genuine, and contains a true statement of what it purports to. In the *Bishop of Meath* v. *Marquis of Winchester*, 2 Bing., 183, TINDAL, C. J., speaking of ancient documents, holds this language: 'It is not necessary that they should be found in the best and most proper place of deposit. If documents continued in such custody, there never would be any question as to their authenticity; but it is when

documents are found in other than their proper place of deposit, that the investigation commences whether it was reasonable and natural under the circumstances in the particular case, to expect that they should have been found in the place where they are actually found; for it is obvious, that while there can be only one place of deposit strictly and absolutely proper, there may be many and various that are reasonable and probable though differing in degree, some being more so, some less; and in those cases, the proposition to be determined is, whether the actual custody is so reasonably and probably accounted for, that it impresses the mind with the conviction, that the instrument found in such custody must be genuine.' "

Many other authorities could be cited to the same effect, which we will not here set forth since there seems to be little, if any conflict as to the general rule governing the admission of ancient documents.

It is not seriously insisted that the instrument in question is not over thirty years of age. In any event, the evidence shows it to be much older.

The statement of Judge NEIL in *Perry* v. *Clift* (Tenn. Ch.), 54 S. W., 121, in passing upon another deed executed by James R. Sage and wife in 1833, is applicable here, viz.:

"The original is sent up, and it bears on its face evidence of great age, in the tattered condition of the paper, its color, and the faded appearance of the ink."

The defendants further introduced in evidence a certified copy of the commission of Judge Ross, from which it appears that he was a common pleas judge in Luzerne county, Pa., when said deed was acknowledged in 1833.

The defendants also introduced in evidence a photographic copy of the oath of office of Judge Ross subscribed in 1829, and there is a pronounced similarity between that signature and the one appearing on the deed in question.

Mr. W. S. Gillespie, a wholly disinterested party, testified that he saw this deed in the hands of Col. S. C. Norwood in 1878 or 1879. This witness was living in Rhea county at the time engaged in practicing law, and in abstracting titles to lands in Rhea and Bledsoe counties. On account of the health of his family he moved to Texas many years ago, where he has since resided. It is true that this witness has no personal recollection at this time of seeing the deed in question, but his old abstract book was introduced in evidence, in which was noted by his amanuensis at his dictation at the time he saw said document in the hands of Col. Norwood the facts pertaining thereto; that is, at that time he noted in this abstract book the fact that the original grant No. 2752 was in the hands of Col. Norwood, and that the deed from Sage to Shannon was transcribed on the back thereof, and Mr. Gillespie testified that he knows the fact to be that way, otherwise he would not have made said entry.

It is conceded that said deed was written on the original grant, and its appearance would indicate that it is about as old as the grant. We are thoroughly satisfied that it is more than thirty years of age.

Relative to said deed having been produced from the proper custody, it appears that in 1918, several years after this suit was instituted, one of the solicitors for the defendants found this instrument among the old papers of Col. S. C. Norwood, then in the possession of his son, John W. Norwood, at his home in Bledsoe county.

Col. Norwood was born in 1822 or 1824 and died about 1902. He lived in Bledsoe county, was a practicing attorney in his early life, was clerk and master for a while, and later in life dealt extensively in mountain lands in that section.

John W. Norwood died without having testified in this cause, but we think the evidence justifies us in concluding that he acquired this paper from his father, and that his father had it in his possession from 1879 until his death.

The serious question is: When and how did Col. Norwood come into the possession of this paper, and is there any evidence to connect his possession thereof with the Shannons so as to make him its proper custodian?

We have searched the record with great care and have been unable to find any evidence to support this contention. There is absolutely no evidence as to when or how this instrument came into the possession of Col. Norwood, and so far as the record shows it may as well be assumed that he held it for the Sages as for the Shannons. The record is absolutely silent as to the custody of this deed from 1833 until it was seen in the possession of Col. Norwood in 1879, a period of nearly a half century.

Learned counsel on both sides have indulged in much speculation about this matter, but have been unable to point out any evidence to support their respective theories, and lawsuits must be determined upon evidence and not upon theories.

Counsel for the defendants state that in June, 1833, E. P. Shannon came to Bledsoe county and entered a five thousand-acre tract, which he had the county surveyor, Peter Hoodenpile, to survey for him, and that he must have brought his Sage deed with him and turned it over to Peter

Sage v. Dayton Coal & Iron Co.

Hoodenpile for some purpose; that Col. Norwood was a son-in-law of Peter Hoodenpile and administered on his estate, and in this way, upon the death of Peter Hoodenpile, he became possessed of this paper.

This is pure imagery and is based upon no evidence. In the first place, there is no direct evidence that Shannon came to Bledsoe county at that time, or at any other time. Counsel base this conclusion solely upon the theory that one could not enter land without appearing in person by virtue of section 7, chapter 49 of the Acts of 1823, which provides as follows:

"Persons wishing to make an entry in any of the land offices, shall produce to the entry taker at the time of making the same, a location in writing, setting forth the nearest water courses, mountains, or remarkable places, the beginning or lines of land already surveyed, or other specialties."

We are cited to no authority construing this act to mean that this information must be furnished by one desiring to enter lands *in propria persona,* and that it cannot be done by an agent.

But assuming that Shannon came to Tennessee, then upon the same assumption it appears that Sage also came, because in the same month he entered a five thousand-acre tract in Bledsoe county, upon which grant No. 3821 was based.

There is nothing in the record to show that after Shannon came to Tennessee in 1833 that he brought this deed with him; or that he turned it over to Peter Hoodenpile; or that Peter Hoodenpile ever had it in his possession; or that Col. Norwood came into possession of this paper as administrator of Peter Hoodenpile. All of these things

have to be assumed to make the Norwood custody a, proper one.

Neither is there a line of evidence tending to show that E. P. Shannon, or any of his heirs, turned this paper over to Col. Norwood, nor is any reason assigned as to why they should have done so; and there is no evidence that Norwood was agent, attorney, trustee, or relative of any of the Shannons. E. P. Shannon died in 1853, which was about twenty-six years before this instrument, was seen in the possession of Col. Norwood. There is no evidence that E. P. Shannon ever had this deed in his possession, or that he ever claimed said land, or exercised any acts of ownership over it, or paid said consideration of $1250.00 or paid any taxes thereon, or established any possession thereon either in person or by agent or tenant, or that he ever advised or consulted with any attorney about said tract of land. There is absolutely nothing to show that Shannon, or his heirs, ever had any connection or dealing of any character with Col. Norwood.

It further appears from the record that $1,250 was a large price for said land in 1833, that Shannon was a man of means, and that he lived twenty years after it is claimed he acquired this deed, and yet he never had same put of record and no reason appears as to why he should have intrusted so valuable a paper for so long a time to some person in Tennessee who was practically a stranger to him.

Furthermore, an old memorandum book of Col. Norwood was introduced in evidence in which Col. Norwood made the following entry:

"G. R. Sage, five thousand acres, beginning at four chestnut trees growing from one root, south thirty-two east one thousand three hundred forty poles, south thirty-eight east six hundred forty poles, south fifty-two east one thou-

sand three hundred forty poles, north thirty-four east six hundred forty poles.

"Not conveyed."

The exact date that this entry was made does not appear; but, judging from memorandums preceding and following it, it was, perhaps, made between 1887 and 1889.

Complainants insist that the words, "Not conveyed," mean that James R. Sage had not conveyed the five thousand-acre tract. While, on the other hand, the defendants insist that it is just as reasonable to say that he intended to convey the idea that Shannon had not conveyed this land.

Col. Norwood had described the Sage grant, and we think he had reference to this grant when he noted, "Not conveyed." The name of Shannon does not appear in this entry, and we do not think it is susceptible of the construction placed thereon by the defendants.

However, we do not place a great deal of importance to this entry, since, judging from prior and subsequent entries, it is more than likely that these notes were made when he was examining the records, and he could have overlooked the fact that an alleged conveyance from Sage to Shannon was written on the Sage grant.

The evidence further shows that James R. Sage, Jr., who was a son of the original grantee, came to Bledsoe county in 1889 to look into the titles of the Sage lands. He sold one of said tracts to Col. Norwood and another to S. L. Robertson and associates, and Robertson and Blackburn both testified that about this time he offered to sell them the tract of land here involved.

Under the foregoing state of facts it cannot be said that either S. C. Norwood or J. W. Norwood were in any way

connected with the Shannons, but, on the other hand, they were strangers to this transaction, and hence the deed which was in their possession was not in proper custody, and was therefore not competent in evidence as an ancient document.

It is further insisted by the defendants that they have perfected their title to this property by seven years' adverse possession.

The chancellor held to the contrary, and we concur in this holding. The defendants deraign their title back to the Patterson grant, which is junior to the Sage grant. Both grants cover the land in controversy. The defendants rely upon two possessions—the Tullus cow pen and the Mathis possession.

Under the facts, as they appear in this record, the Tullus cow pen inclosure hardly rises to the dignity of an adverse possession. In 1890 Tom Henderson was in the employ of the Dayton Coal & Iron Company, his duty being to look after its land and to keep trespassers from cutting timber therefrom. Tullus had a large number of cattle that ranged on this land. He employed Tom Henderson to build a rail pen on said land to use in salting his cattle, and paid him $20 per month to look after and salt his cattle. This continued for two years, and the two years following Tom Henderson planted a portion of the land within the enclosure in corn, potatoes and turnips. It was never cultivated afterwards and only a portion of it was cleared. The original enclosure was about two acres. After Tullus used same for salting cattle it was used from time to time by other parties who had cattle in that section. The fence would be down at periods; there was usually a gap in it; it burned a number of times, and every time it would

burn some cattle men would rebuild it but would make the inclosure smaller; and, according to the testimony of Will Anderson, in 1908 or 1909 it only inclosed a quarter of an acre.

Mrs. Henderson, who was seventy-six years of age, the widow of Tom Henderson, and who had lived in that section all of her life, testified that some of the parties interested in the Dayton Coal & Iron Company, accompanied by the superintendent, came upon this pen one day and asked her husband what it was, and upon being advised that it was built to salt cattle in, told her husband to take it away if he could use the rails, that they did not want it on their land, and that her husband thereupon hauled three or four loads of rails from said pen and placed them upon a fence which inclosed a deer park.

Some of the witnesses testified that they heard Tom Henderson say that he got permission from the company to construct this pen for old man Tullus. This pen was built in an out of the way place, not on any road, although a trail or path passes by it.

Taking the evidence as a whole, we do not think the company intended to maintain this as a possession, and it was certainly not such a possession as would in law perfect their title to this large tract of land.

We are further of the opinion that the record does not show by a preponderance of the evidence that the Dayton Company claimed the Mathis possession as a part of the Patterson grant. Old man Mathis owned a three hundred twenty-acre tract of land adjoining the Patterson tract, or what is referred to in the record as the Berger tract. The Mathis house and clearing, of a few acres, was supposed to be on the three hundred twenty-acre tract.

Mrs. Henderson, who, as previously stated, had lived in that section all of her life, testified that it was generally understood in that country that said house and clearing were on the three hundred twenty-acre tract; that old man Mathis lived there for years and claimed it.

There is a controversy as to whether that house and clearing are on the three hundred twenty-acre tract or the Patterson tract.

Blackburn had surveyed out these lands and testified that this house and clearing were on the three hundred twenty-acre tract, and same appeared also from a map exhibited with his deposition.

Whereupon the parties entered into the following stipulation:

"It is stipulated in this case that the three tracts mentioned in the deed from Payne and others to J. M. Burnup and now owned by the Dayton Coal & Iron Company are older titles than the Sage grant, and the possession on the three hundred twenty acres that is referred to in the testimony is not available to the defendants in this case, because held under older and separate title as shown by map filed by Mr. Blackburn."

The record discloses that the possession referred to is the Mathis house and lot. The defendants' interpretation of this stipulation is that it is an admission that the title to the three hundred twenty acre tract is older than the Sage grant, and that this stipulation or agreement did not preclude them from proving that the Mathis possession was on the Patterson grant and not on the three hundred twenty-acre tract.

In this counsel are in error. This stipulation, when taken in connection with the Backburn map, simply means

that the Mathis possession is not available to the defendants. They are now seeking to do what they expressly agreed not to do, viz. to rely upon the Mathis possession as a bar to complainant's right to recover.

It further appears that when the Dayton company purchased the Patterson tract from Fleming, there was excluded several tracts "as shown on the Fleming map," aggregating two hundred seventy-nine acres. Said map has been introduced in evidence and shows that one of these excluded tracts contains one hundred twenty-five acres, and the evidence indicates that the Mathis possession was on this one hundred twenty-five-acre tract. The defendants have not shown to our satisfaction that they maintain said Mathis possession upon the theory that it was located on the Patterson grant. In our opinion, the defendants have not sustained their plea of the statute of limitations of seven years.

The chancellor held that the alleged deed from Sage to Shannon was valid, and dismissed the complainants' bill.

In this he was in error, and it results that a decree will be entered here in conformity with this opinion; that is, decreeing the land sued for to the complainants, and the cause will be remanded for further proceedings.

The costs in the chancery court and in this court will be paid by the defendants.