**UNITED STATES v. McCULLEY et al.**

No. 1084.

United States District Court
E. D. Tennessee, N. D.
Sept. 21, 1951.

---

1. See 28 U.S.C.A. § 1346.

Otto T. Ault, U. S. Dist. Atty., Chattanooga, Tenn., Ferdinand Powell, Jr., Asst. U. S. Dist. Atty., Knoxville, Tenn., for plaintiff.

Forrest Andrews, James A. Fowler, Fowler, Long & Fowler, and Francis W. Headman, all of Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is an action to quiet title to a tract of land containing 4,025 acres, situated in Blount County, Tennessee, and included within the boundaries of the Smoky Mountains National Park. An exact description of the land in controversy by metes and bounds is not deemed necessary for disposition of the case, for the reason that it is contained wholly within the larger boundary of the Park and within the boundaries of two tracts, the Aluminum Company

of America tract and the Morton Butler Timber Company tract, acquired by the Government by condemnation and described by metes and bounds in the condemnation decrees, both of which are of record in the Register's Office of Blount County, Tennessee. The tract of 4,025 acres is claimed by the heirs of Andrew McCulley, deceased, who obtained a grant thereto, which grant is shown to have been subsequent to earlier grants obtained by the Government's predecessors in title, the McCulley claimants, however, insisting that their inferior grant ripened into an indefeasible title by virtue of 7 years, or more, of adverse possession.

For convenience in disposing of the case the subject land is designated as that portion which lies west of Hannah Mountain and that portion which lies east of Hannah Mountain. That which lies west of Hannah Mountain may also be designated as the Aluminum Company tract, and that which lies east of Hannah Mountain as the Morton Butler Timber Company tract. The Aluminum Company, or western, tract was acquired by the Government by condemnation decree which was recorded in the Register's Office of Blount County on October 25, 1940. The Morton Butler Timber Company, or eastern, tract was acquired by the Government by condemnation decree which was recorded in the Register's Office of Blount County on November 30, 1940. These recording dates are important for the reason that the McCulley heirs did not undertake to assert their claim to any of the controversial land until November 29, 1947, when they commenced suit in the Chancery Court of Blount County, Tennessee, against Blair Ross, Smoky Mountains National Park Superintendent, to enjoin him from interfering with their rights and interests in the land and for a decree quieting their title and putting them in possession.

Comparison of dates shows that the Government had a record title of more than seven years standing as to the Aluminum Company tract and of seven years, lacking one day, as to the Morton Butler Timber Company tract before any adverse claim was asserted by the McCulleys. Under the Tennessee seven-year statute, Code Section 8582, the Government acquired an indefeasible title to the Aluminum Company tract by condemnation decree and seven years of subsequent adverse possession, if this possession was adverse. Accordingly, the controversial land lying west of Hannah Mountain may for the present be put aside until examination is made of the proof on the question of possession.

As to the controversial land lying east of Hannah Mountain, the Government had not had seven years of adverse possession prior to the suit in Blount County, but it appears from the record that Morton Butler Timber Company, the Government's immediate predecessor in title, had owned the land for more than seven years by recorded deeds. It acquired 24,425 acres of land by deed recorded February 17, 1912, and 799.3 acres by deed recorded May 12, 1923. The unsold portion of these two tracts was acquired by the Government as heretofore noted by condemnation decree and recorded on November 30, 1940. The main body of this land had been owned by the Morton Butler Timber Company since February 17, 1912, or approximately 28 years; the other it had owned from May 12, 1923, or approximately 17 years.

Whether the Government has acquired an indefeasible title to all of the disputed 4,025 acres turns on the nature of possession held by the various title holders, and these are the pertinent questions:

(1) Was the possession of Andrew McCulley sufficient to oust the title of those who claimed the land under prior grants?

(2) Was the possession of the Morton Butler Timber Company sufficient to oust the title, if any, acquired by McCulley to the Morton Butler Timber Company, or eastern, tract?

(3) Has the possession of the Government been sufficient to oust the title, if any, acquired by McCulley to the Aluminum Company, or western, tract?

In 1886, A. J. (Andrew) McCulley received from the State of Tennessee Grant No. 42,005 for 4,025 acres. This grant was recorded in the land office for East Tennessee at Knoxville on March 24, 1886, and in the Register's Office of Blount Coun-

ty, Tennessee, May 7, 1886. Those from whom the Government acquired title to the same, and other lands, traced their titles back to grants many years prior to the McCulley grant.

Following receipt of his grant in 1886, Andrew McCulley made some use of the land. He did not at any time establish a home for himself and his family thereon. Although much of the land could have been cleared and cropped, he did no clearing or farming thereon. He erected on the grant a crude camp, or shelter, and this he replaced with a small cabin. This cabin, destroyed by fire and rebuilt two or three times, was used by him as well as by others occasionally, as a camping place not for the purpose of exercising dominion over the land against trespassers, but as a shelter during certain periods when he herded cattle in the mountains. There is some indication that he made a brush fence around the cabin and a small parcel of adjacent ground and maintained it during a few seasons, but the 4,025-acre tract was otherwise unfenced, the whole region of the grant and many thousand acres of adjoining lands being open range. From April or May to October of each year McCulley, and others as well, herded cattle on this range. McCulley had a small herd of his own, also some hogs, which ran on the range. Other cattle owners ran their stock on the range, either looking after them in person or hiring herders to look after them. One owner's cattle were distinguished from those of other owners by ear marks and not by brands. Herding of cattle was done by the owners at will without asking permission from land claimants. During the seasons of early fall, winter and early spring, no herding was done on the range. During those seasons the only persons making use of the range were hunters. During the range season the herds were kept intact by a herder, whose chief aid was salt. Andrew McCulley went on the range on Monday morning, staying until he had salted and otherwise looked after his herd, afterwards returning home where he stayed during the remainder of the week, the cabin on his grant being used as a shelter from rain or snow, not as a residence. As a shelter, it was available to any herder or hunter who happened to be in its vicinity in time of need.

Andrew McCulley lived with his family on a tract of land known as the Caughorn place, which was about one mile from the McCulley grant at its closest point. He made his living on the Caughorn place by general farming. Herding cattle was a sideline, a part only of his means of livelihood. Such possession as he exercised over his grant lasted seven or eight years. He moved away from the Caughorn place about 1894 and did not return to the neighborhood, except for one or two visits. He died in 1904. Upon leaving the Caughorn property he moved to Sevier County, Tennessee, the county from which he had come prior to his residence on the Caughorn property. He left his grant in charge of his relatives and others, who continued to run cattle thereon for a few years, but neither he nor anyone on his behalf, or on behalf of these claimants, ever paid any taxes on any part of the land.

Range, as the term is used by witnesses, did not relate to any definite boundary. Many thousands of acres of mountain land were unfenced and subject to free use by cattle owners. A number of men held themselves out as cattle herders. To these men stock owners brought their cattle and contracted for herding at an agreed price per head for a season. The herders decided among themselves where each herder would range the cattle under his care. His territory was regarded then as his range for the season. It was not possible to confine the cattle closely to the designated range, but there was enough territory between herds to enable a herder to round up strays without their becoming lost in other herds to any great extent. Andrew McCulley was a herder, and that part of the mountains appropriated by, or allotted to, him was known as the McCulley range. His range was neither coterminous with nor limited to the boundaries of the McCulley grant. Nor were the ranges of other herders restricted to mountain areas outside of the McCulley grant. Aside from

this rough distribution of mountain areas among the cattle herders, the land was open and the ranging indiscriminate.

This indiscriminate ranging of cattle was discontinued about 1910. It was on December 3, 1910, that Morton Butler acquired title to lands which included that part of the McCulley claim lying east of Hannah Mountain, this being included in a large boundary that in 1912 was conveyed by Morton Butler to Morton Butler Timber Company.

After 1910, and indeed after some years prior thereto, there is no evidence of any use having been made by the McCulleys of the land included in the McCulley grant. The free range system that existed during the time Andrew McCulley ran cattle in the mountains disappeared, and a lease system was established, lands along Hannah Mountain and the broad area extending upwards into the Smoky Mountains being rented to cattle owners or herders for range purposes. The lessor of the lands was Morton Butler Timber Company, operating through agents who entered into the lease arrangements and collected the rents. This lease system was continued for considerably more than seven years, one witness placing the duration as 25 or 30 years, and the right to lease and collect rentals was not contested by any of the McCulleys, or by anyone in their behalf or claiming through them. Following acquisition of the land by Morton Butler Timber Company, the people who lived in the vicinity thereof ceased to think of any part as being McCulley land, but regarded the whole as Company land. There is no evidence that any lease had ever been taken from Andrew McCulley or from his heirs, at any time, but there is much evidence to the contrary. There is evidence that Andrew McCulley enjoyed a limited use of the McCulley grant, but it was not an exclusive use and enjoyment. Herders who had used the land before the date of his grant continued to use it as before, and no one was ever required to obtain his consent to make the same use that he himself made of the land. This situation changed radically when the Morton Butler Timber Company acquired the land. The Company made its owner-

ship felt by requiring herders to obtain leases and to pay rents. From all that appears in the record, what Andrew McCulley did, allegedly under color of title, he could as readily have done without color of title, and other cattle owners did what he did, one witness testifying that hundreds of cattle ranged through Hannah Mountain country during Andrew McCulley's time there.

■ What constitutes adverse possession has been stated in many decisions in this State. It requires the presence of certain definite ingredients. The essential ones are, that the possession be open, notorious, continuous, exclusive, actual, and of course adverse. Green v. Cumberland Coal & Coke Co., 110 Tenn. 35, 72 S.W. 459; Pullen v. Hopkins, Clark & Co., 69 Tenn. 741.

■■ The word "adverse" itself means against, or antagonistic. As applied to land, it means a possession that is hostile to any other and unauthorized possession, including especially that of the true owner. Basis of the hostility is assertion of a title that is itself antagonistic. If there is no outstanding title in another person, the element of antagonism is not present. Adverse possession, as the term is here used, is in negation of another's title. It may be, as in this case, that the assurance of title of the adverse possessor is void for the reason that his grantor had no title to convey. The claimant under the void title must, in order to oust the true owner, oust him actually and openly by a hostile and exclusive possession, and must exclude him uninterruptedly for seven years.

■ Measured by this test the possession of McCulley was insufficient. In the first place, it was not continuous. Instead, it was intermittent, of the nature of casual or seasonal trespass, which is not enough to satisfy the rigid requirements of adverse possession. Sage v. Dayton Coal & Iron Co., 148 Tenn. 1, 251 S.W. 780; Hubbard v. Godfrey, 100 Tenn. 150, 47 S.W. 81; King v. Mabry, 71 Tenn. 237, 239.

■ Again, the possession must be comparable to the susceptible uses to which a person of the claimant's character and oc-

cupation would normally make of the land. Southern Iron & Coal Co. v. Schwoon, 124 Tenn. 176, 135 S.W. 785; Pullen v. Hopkins, Clark & Co., 69 Tenn. 741. Here McCulley, the adverse claimant, ranged cattle on the land during the pasture season. He appropriated none of the land for farm crops, although by the evidence much of it could have been cleared and farmed.

As heretofore indicated, McCulley's possession was not exclusive. The proof is equally conclusive that it was not actual. It is not shown that the land was not susceptible of fencing. Actual possession usually requires enclosure. Pullen v. Hopkins, Clark & Co., 69 Tenn. 741. Actual possession requires more than a casual use, more than the erection of a shelter or a stock pen for casual use, and more than a spot of cultivation within an unfenced wilderness of several thousand acres. Southern Iron & Coal Co. v. Schwoon, 124 Tenn. 176, 135 S.W. 785; Sage v. Dayton Coal & Iron Co., 148 Tenn. 1, 251 S.W. 780; Hubbard v. Godfrey 100 Tenn. 150, 47 S.W. 81; Pullen v. Hopkins, Clark & Co., 69 Tenn. 741; Foster v. Grizzle, 41 Tenn. 530; Green v. Cumberland Coal & Coke Co., 110 Tenn. 35, 72 S.W. 459. This requirement of adverse possession, as well as the other requirements, being in negation of the rights of the true owner, puts upon the adverse claimant, in order to effect an ouster of title from the true owner, the burden of proving an adverse possession inclusive of all of its elements. Southern Coal & Iron Co. v. Schwoon, 145 Tenn. 191, 239 S.W. 398; Jones v. Coal Creek Mining & Mfg. Co., 133 Tenn. 183, 180 S.W. 991.

Because of what has heretofore been stated, the Court is of the opinion that Andrew McCulley and his heirs did not perfect title to the McCulley grant by seven years of adverse possession. The case might end here, but as a further support of the Court's conclusion a comparison may well be made of the possession of McCulley with that of Morton Butler Timber Company. It is possible that neither claimant established that rigorous possession required to defeat the title of a true owner, but the comparison shows that the possession of Morton Butler Timber Company came nearer to meeting the rigid requirements than did that of McCulley. The timber company had deeds from prior title holders. The deeds had been recorded in the register's office of the county in which the land is situated. Thereafter the timber company held undisputed and uninterrupted possession for more than seven years. That possession was exclusive in that former users of the land for range purposes were required to obtain leases from and pay rent to the timber company. As lessees or tenants of the timber company, the users extended the timber company's actual possession during the lease seasons. The timber company's possession was open and notorious, as well as exclusive, continuous, adverse, and to a substantial degree, actual. Some of the witnesses "understood" that the timber company had sawmills located on the land and that large quantities of timber were processed there. The point here is, that though Morton Butler Timber Company's adverse possession may not have been as comprehensive and adverse as it should have been, it came nearer to meeting the requirements of adverse possession than did that of McCulley, the result being that if McCulley did acquire title by adverse possession under color of title, that title was lost in the same manner in which it was acquired, namely, by seven years, and more, of adverse possession under color of title by Morton Butler Timber Company. The ultimate result is, that the Government's lack of seven years of adverse possession of the timber company tract is immaterial. The Government's immediate predecessor, the Morton Butler Timber Company, had ousted the McCulleys, if they were in any position from which ousting was necessary, and the Government acquired all that the timber company had in the way of title when it acquired the land by condemnation.

As to the Aluminum Company tract, including that part of the McCulley grant lying west of Hannah Mountain, the unassailable position of the Government is even clearer. As to this portion of the McCulley grant, the Court is of the opinion

that the McCulley title was never perfected for reasons heretofore stated relative to that part of the McCulley grant lying east of Hannah Mountain. But if for some reason not presently apparent it was perfected, it was lost by the McCulleys and acquired by the Government by virtue of the condemnation decree and seven years of subsequent adverse possession. The Government's assurance of title has been of record more than seven years. This title goes back to a number of grants from the State of Tennessee. Since its acquisition of the land and for sometime before, the Government has exercised control and held possession. That possession was not disputed until after seven years from the time the assurance of title was recorded. It has been open, notorious, continuous, actual, adverse, and exclusive throughout the required seven years. The Government has erected signs along the roads and trails leading through the land, declaring the Government's ownership and prohibiting any acts inconsistent with the purpose for which the Government acquired the land. The Government has prohibited any herding of stock on the land, as well as any hunting and agricultural activities. It has promulgated regulations as to fishing in its streams and as to other park privileges that may be enjoyed. It has closed as many of the approaches as it has deemed proper and opened others. It has employed park officials, including rangers, who have authority to enforce, and who do enforce its regulations and compel respect for its ownership.

 There is a further theory upon which the Government's title to all of the land in dispute, is maintainable. If the possession of Andrew McCulley was sufficient to oust the title holders through color of title and seven years of adverse possession, the possession of Morton Butler Timber Company was sufficient to oust the McCulleys. This is true because the record shows that Morton Butler Timber Company asserted and maintained a more comprehensive and more generally recognized possession than that of the McCulleys. On the other hand, if neither Morton Butler Timber Company nor the McCulleys had sufficient possession to operate adversely against the title holders, then the owners by prior grants were never ousted from their ownership. This is under the rule that when no claimant has actual possession the constructive possession is in the title holder. Green v. Cumberland Coal & Coke Co., 110 Tenn. 35, 72 S.W. 459; Walker v. Fox, 85 Tenn. 154, 2 S.W. 98. The Government has been able to deraign its title back to four grants, all of which were prior to the McCulley grant. On paper the Government acquired a good title. Under the aforesaid rule of constructive possession, there is no hiatus in the title. The result is that whether the Government's title is based upon a favorable comparison of adverse possession or on the rule of constructive possession, the Government's title is good.

The Government has urged several other theories in support of its title, examination of which is not deemed necessary for the reason that adverse possession under color of title is determinative of the case in the Government's favor.

The United States of America, the plaintiff in the case, is entitled to judgment, and final orders and decrees will be prepared granting plaintiff all of the relief prayed for in the complaint, provided, however, that in lieu of the quit-claim deed called for by the plaintiff, a decree divesting title out of the defendants and vesting the same in the United States of America will be prepared.