UNITED STATES of America,

v.

Howard B. CHATHAM and wife, Mrs. Howard B. Chatham.

Civ. No. 1949.

United States District Court
W. D. North Carolina,
Asheville Division.

Aug. 31, 1962.

William Medford, U. S. Atty., Robert J. Robinson and James O. Israel, Asst. U. S. Attys., Asheville, N. C., William W. Bargeron, Attorney Office General Counsel USDA, Atlanta, Ga., for plaintiff.

C. E. Hyde, Murphy, N. C., for defendant.

**WARLICK, Chief Judge.**

This action was commenced by the United States of America, as an action to quiet title to two tracts of land in Macon County, North Carolina, which constitute a part of the Nantahala National Forest. The complaint also seeks a money judgment for the cutting and removing of timber from these tracts by the defendants and an injunction to prevent the further cutting and removing of timber.

In their answer the defendants admit the Plaintiff's ownership of one tract, the C. A. Pace Tract, or Tract No. 505. Therefore, with reference to this tract the only question is what damages, if any, should the plaintiff recover for the cutting and removing of timber therefrom.

The defendants claim title to a 128½ acre tract that laps over and covers almost all of the other tract, the C. Y. McAden Tract, or Tract No. 238–I that contains 80.8 acres. The ownership of this tract and the question of damages for the cutting and removing of timber therefrom are both in controversy.

This matter came on for hearing on a motion for summary judgment filed by plaintiffs at the Asheville Civil Term in July, 1961. After considering the matter, the motion was granted upon the ground that the defendants were estopped from claiming title to Tract No. 238–I because their predecessor in title, namely Macon County, was named as a party defendant and served with summons in the condemnation proceedings through which the Government acquired title. The defendants appealed and this decision was reversed and remanded.

In his opinion filed therein, Judge Haynsworth stated:

"In granting summary judgment for the United States, the District Court did not consider whether the condemnation proceedings were effective to vest in the United States title to the disputed lands good against the Heads. It held that, because Macon County was at least a technical party to the condemnation proceedings, it was estopped to claim the lands adversely to the United States. It concluded that Macon County's grantees acquired no greater right than their grantor could enforce.

"In that conclusion, we think the District Court carried the doctrine of estoppel too far."

The case came on again for trial at a Civil Term in July, 1962. The defendants requested a trial by jury, however plaintiff moved that the question of title be heard by the Court, since an action to quiet title is an equitable proceeding, it should be heard by the Court without a jury, but the question of the damages

should be submitted to a jury. This motion was granted, a jury empaneled with the understanding that, if the Court should find that the plaintiff was the owner of the land, then the verdict of the jury for the damages for cutting and removal of timber would become a part of the judgment of the Court. Otherwise, the verdict of the jury would be disregarded. ·

Both plaintiff and the defendants presented evidence. Based upon the evidence presented and the jury's verdict, the following facts are found:

FINDINGS OF FACT:

That on December 14, 1936, plaintiff condemned, along with several other tracts of land, the C. Y. McAden Tract, or Tract No. 238–I, containing 80.8 acres, by a condemnation proceeding entitled "U. S. v. 2,922.72 acres of Land in Cherokee, Jackson and Macon Counties, North Carolina, Claude B. Burgess, et al.," At. Law No. 311, in the District Court for the Western District of North Carolina. A metes and bounds description of that tract is set out in the complaint that was filed therein.

The heirs of C. Y. McAden were all named parties to this condemnation proceeding and filed answers admitting ownership.

The petition in the condemnation proceeding requested the Court "to make all unknown parties having any interest therein parties defendant hereto." The order of the Court directing the service of summons upon the non-resident defendants by publication and the actual notice of summons that was published in the appropriate newspapers also directs all unknown claimants to take notice that the action has been commenced and requires that they appear and answer the petition not later than ten (10) days after the completion of service of summons by publication, or the prayer of the petition will be granted. No unknown claimants appeared. A judgment was entered on December 14, 1936, that was filed for recording in the office of the Register of Deeds of Macon County

on January 20, 1937, and recorded in Book 128, Page 113, which states that the "entire and unencumbered fee is hereby condemned for the public use and purposes set out in the petition and the title thereto vested in the United States of America, to the sole public use and benefit of the United States of America, upon the payment into the Registry of the Court the just compensation therefor." The judgment further directs "all persons, whether named herein or not, who may have, or claim to have any title to or interest in or lien upon said property in conflict with or adverse to the title, interest or claim or lien of any other person * * * to pursue the funds paid into Court * * * without further concern of the United States." Appraisers were appointed, appraisals made, the appraised amounts were paid into the Registry of the Court, and distributed under order of the Court.

Plaintiff entered upon Tract No. 238–I immediately thereafter, marked the boundaries thereof and included the same as part of its Nantahala National Forest. The forest rangers made frequent trips across this tract, maintained a fire watch over, and, in general possessed the same in the name of the United States of America, and supervised and controlled it as a part of the Nantahala National Forest. Some Chestnut timber was sold therefrom in 1944. This possession and control has continued down to the present, though the defendants entered upon the land and started cutting timber therefrom in 1956.

That from 1936 until 1956, as far as the plaintiff knew, the title to this tract of land had never been questioned. Plaintiff certainly did not know that William P. Head or any of his heirs were claiming title to any part thereof. Its possession had not been interfered with.

In 1956 certain individuals claiming to have purchased timber from the defendants started cutting and removing timber therefrom. The defendants produced a deed from Macon County to them, dated August 30, 1956, that described a 128½

acre tract that overlapped practically all 80.8 acres of Tract No. 238–I. The evidence indicates that on September 27, 1905, S. C. Rhodes and others conveyed to one William P. Head this 128½ acre tract and on the same date another tract, containing 15 acres, more or less was also conveyed to William P. Head.

William P. Head immediately moved into a house that was located on the 15 acre tract, some 300 or more feet from the boundary of Tract No. 238–I and on the opposite side of the main road and across a creek therefrom and lived in this house until his death in 1928. That he tended fields on this 128½ acre tract, a part of which was located on Tract No. 238–I; and that he and members of his family from time to time cut firewood and other timber products from the remaining part of the 128½ acre tract, which included practically all of Tract No. 238–I.

That by 1932 all the heirs of William P. Head ceased to cultivate any of the land or cut any timber from the 128½ acre tract and had moved from the house on the 15 acre tract; Mrs. William P. Head died in 1933 and the house was rented by one of the heirs, to one "General" Buck Godfrey, who at times cultivated some of the same fields and pastured his milk cow thereon until he moved completely away from the property in 1943.

That though listed on the county tax books in the name of William P. Head, no taxes were paid to Macon County from the year 1928 when Head died up to and including the year 1940. In 1942 Macon County instituted a tax foreclosure proceeding against the heirs of William P. Head and both tracts of land were bid in by Macon County at a tax foreclosure sale, held September 21, 1942, but no deed was made to Macon County until August 30, 1956.

That there was no one living on the land or exercising any acts of possession adverse to the plaintiff from the year 1943 until August 30, 1956, when the agents of defendants started cutting timber from the land and, thereafter the plaintiff still continued to exercise its regular routine possession.

On August 30, 1956, R. S. Jones, Commissioner in the tax foreclosure proceeding, executed a deed to Macon County for both tracts, thereby completing the tax foreclosure sale started in 1942; and on the same date Macon County executed a deed for both tracts to the defendant, who caused to be cut and removed some 54,000 feet of various species of saw timber from Tract No. 238–I and Tract No. 505 and some 1,843 fence posts from Tract No. 238–I.

That as soon as the plaintiff discovered the timber cutting operations the defendants were directed to and did cease cutting and removing timber from said lands, and thereafter this action instituted.

The jury found that the value of the timber products cut and removed from Tract No. 505 was $50 and the value of the timber products cut and removed from Tract No. 238–I was $450.

CONTENTIONS

The defendants contend that William P. Head acquired title to the 128½ acre tract, which includes practically all of 80.8 acres of Tract No. 238I, prior to his death by adverse possession under color of title based upon the deed from S. C. Rhodes and others in 1905 and that after his death this title descended to his heirs; that for these heirs to be divested of title by the condemnation proceeding they would have to have been made parties thereto by name and given notice; that since they were not made parties to the proceeding and served with notice they still owned an interest in the land that could be taxed by Macon County; that this interest passed to Macon County by the bid at the tax foreclosure sale in 1942, and the deed from R. S. Jones, Commissioner, on August 30, 1956, and was conveyed by Macon County to the defendants by deed on the same date.

The plaintiff contends that it acquired title to the land in question in the con-

demnation proceeding; that this proceeding was a proceeding *in rem* and regardless of who actually owned the legal title, it passed to the United States as a result of this condemnation proceeding; that actual notice was given to all parties claiming the land that were known to the plaintiff and that the heirs of William P. Head were given notice as unknown claimants in the manner required by the laws of North Carolina, which is the law that controlled the procedure for acquiring title by condemnation in 1936.

The plaintiff further contends that, in any event, the decree of condemnation, which was recorded in Macon County, was sufficient to become color of title and since the plaintiff was the only one in possession of this tract of land, exercising undisputed control, dominion and possession thereof, certainly after 1943, any defects in the title by the decree of condemnation would have been cured by the plaintiff's adverse possession under color of title for seven (7) years, as required by the General Statutes of North Carolina, § 1–38.

## DISCUSSION

■ Conceding that William P. Head's possession of the 128½ acre tract, which included practically all of Tract No. 238–I, may have ripened into a good title by adverse possession under color of title, the question first becomes whether or not the notice given by publication to the unknown claimants in the condemnation proceeding was sufficient notice to the heirs of William P. Head. At the time the condemnation proceeding was instituted in 1936, the provisions of Title 40 U.S.C.A. §§ 257 and 258, required the Federal Government to adopt forms and methods of procedure afforded by the State Law, but Federal Courts are not bound by State law on questions of substantive right. United States v. Miller, 317 U.S. 369(3), 63 S.Ct. 276, 87 L.Ed. 336.

40 United States Code Annotated, § 258, in effect in 1936, requires that eminent domain proceedings "shall conform as near as may be" to the practice and pleadings in the courts of the state within in which the district court is held. Therefore, one will have to examine the North Carolina law to see what was required in the way of notice.

North Carolina General Statutes, § 40–14, which provides a method for giving notice of condemnation proceedings to unknown owners, reads as follows:

"Service where parties unknown. —If the person on whom such service of summons and petition is to be made is unknown, or his residence is unknown and cannot by reasonable diligence be ascertained, then such service may be made under the direction of the court, by publishing a notice, stating the time and place within which such person must appear and plead, the object thereof, with a description of the land to be affected by the proceeding, in a paper, if there be one, printed in the county where the land is situated, once in each week, for four weeks previous to the time fixed by the court, and if there be no paper printed in such county, then in a newspaper printed in the city of Raleigh. (Code, s. 1944, subsec. 5; Rev., s. 2582; C.S., s. 1718.)"

The condemnation proceedings depended upon by plaintiff followed this law. The petition stated that there might be unknown claimants and requested that they be made parties. The order directing service by publication on unknown non-resident defendants also directed service upon unknown claimants. The notice published in accordance with the order is directed to the named defendants and unknown claimants or parties to the proceeding. It stated the time and place to appear and plead, the object and the description of the land. It was published in a paper in Macon County for four weeks previous to the time fixed by the Court. It conformed as closely as could be to the requirements of the North Carolina Statute. Therefore, if notice can be given to unknown

claimants by publication, this is a case where it was given.

In the case of Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), sufficiency of notice to unknown parties was put at issue. At page 317, at page 658 of 70 S.Ct., the Court states:

"It has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights. Cunnius v. Reading School District, 198 U.S. 458, 25 S.Ct. 721, 49 L.Ed. 1125; Blinn v. Nelson, 222 U.S. 1 [32 S.Ct. 1, 56 L.Ed. 65]."

Speaking on the question of publication, 339 U.S. at page 316, 70 S.Ct. at page 658, Justice Jackson says, in the Mullane case:

" * * * publication traditionally has been acceptable as notification supplemental to other action which in itself may reasonably be expected to convey a warning. The ways of an owner with tangible property are such that he usually arranges means to learn of any direct attack upon his possessory or proprietary rights. Hence, libel of a ship, attachment of a chattel or entry upon real estate in the name of law may reasonably be expected to come promptly to the owner's attention. When the state within which the owner has located such property seizes it for some reason, publication or posting affords an additional measure of notification. A state may indulge the assumption that one who has left tangible property in the state either has abandoned it, in which case proceedings against it deprive him of nothing, * * * or that he has left some caretaker under a duty to let him know that it is being jeopardized."

The Mullane case quotes Chief Justice Marshall as saying in The Mary, 9 Cranch 126, 144, 3 L.Ed. 678, "It is the part of common prudence for all those who have any interest in [a thing], to guard that interest by persons who are in a situation to protect it."

In United States v. Ivie, D.C., 163 F.Supp. 138, a case almost identical with the case at bar, the District Court stated that the fact that the defendant claimant was not made a party to the condemnation proceeding by the Federal Government and had no actual or constructive notice of the proceeding did not impair the title that the United States acquired in the condemnation proceeding; that "a condemnation proceeding was an action *in rem*. It is not the taking of the rights of designated persons, but the taking of the property itself." It cites as authority for this statement: Eagle Lake Improvement Co. v. United States, 5 Cir., 160 F.2d 182; Duckett & Company v. United States, 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216.

It further states that "the fact that the defendant Ivie was not a party to the proceeding and had no actual notice of the same, and the further fact that constructive notice to her has not been shown, does not impair the title of the United States which it acquired in the *in rem* proceedings". City of Oakland v. United States, 9 Cir., 124 F.2d 959; Norman Lumber Co. v. United States, 4 Cir., 223 F.2d 868; Eagle Lake Improvement Co. v. United States, supra; Cook v. State Highway Board, 162 Ga. 84, 102, 132 S.E. 902.

The Court further stated that since it was holding that the United States had a good title to the land in question it was not necessary to decide whether or not the defendant Mrs. Pearl Cash Ivie's claim to an interest in the land was valid, and cites as authority: Rambo v. United States, 5 Cir., 145 F.2d 670; United States v. Patterson, 5 Cir., 206 F.2d 345, 348.

In this case title to Tract No. 238–I was vested in the United States by the condemnation proceeding in 1936, which was a proceeding *in rem*. The heirs of William P. Head were given construc-

tive notice of the proceeding by being named as unknown claimants in the publication. They failed to assert any rights that they may have had to file an answer. The judgment in condemnation passed title to the plaintiff. The heirs of William P. Head were relegated at that time to claim against the fund paid into court, which was the appraised value of the land, for conpensation for any claim that they may have had.

■ An additional ground upon which the title of the plaintiff can be sustained is that the plaintiff has been in possession under known and visible lines and boundaries and color of title for seven (7) years as required by General Statutes of North Carolina, § 1–38.

■ The decree in condemnation constituted color of title. Such possession, of course, must be adverse; that is, title must be claimed against all the world. What constitutes adverse possession within the meaning of the law is well settled by the decisions of the North Carolina court. As stated in Locklear v. Savage, 159 N.C. 236, at page 192, 74 S.E. 347, at page 348:

"It consists in actual possession, with an intent to hold solely for the possessor to the exclusion of others, and is denoted by the exercise of acts of dominion over the land, in making the ordinary use and taking the ordinary profits of which it is susceptible in its present state; such acts to be so repeated as to show that they are done in the character of owner, in opposition to right or claim of any other person, and not merely as an occasional trespasser. It must be decided and notorious as the nature of the land will permit, affording unequivocal indication to all persons that he is exercising thereon the dominion of owner." Also see Williams v. Buchanan, 23 N.C. 535.

There was no one living on the property certainly between the years of 1943 and 1956. The Government's possession was exclusive during this period. The area claimed was known. The boundaries under which plaintiff was claiming were well marked. The forest rangers were exercising such acts of possession, supervision and control over this land as it was susceptible. On one occasion during this period, some Chestnut timber was sold, from the land. The rangers periodically crossed the land and maintained a fire watch over the land. Generally the Government exercised the same acts of possession and control over this tract as it exercises over the vast areas that make up the Nantahala National Forest.

■ The possession has to be under color of title. What kind of instruments will constitute color of title is well defined in the law. Two North Carolina cases go into the question generally. Walker, J. in Burns v. Stewart, 162 N.C. 360, 365, 78 S.E. 321, 323:

"Color of title has been variously defined by the courts of this country. It was early held to be any writing which on its face professes to pass a title, but which it fails to do, either from want of title in the person making it, or from the defective mode of conveyance employed; but it must not be so obviously defective as not to mislead a person of ordinary capacity but not skilled in the law. (citation of authorities). The courts have generally concurred in defining it to be that which in appearance is title, but which in reality is not."

Johnson v. McLamb, 247 N.C. 534, at p. 536, 101 S.E.2d 311, at p. 313:

"Ordinarily any instrument constitutes color of title if it purports to convey title but is defective or void (First Citizens Bank & Trust Co. v. Parker, 235 N.C. 326, 69 S.E. 2d 841) for matters dehors the record (Lofton v. Barber, 226 N.C. 481, 39 S.E.2d 263), or even if the defects are discoverable from the record. Perry v. Bassenger, 219 N.C. 838, 15 S.E.2d 365."

The case of United States v. McCulley, D.C., 100 F.Supp. 379, at p. 384–385, specifically holds that a decree in condemnation was sufficient to constitute color of title. This case involved the lands of the Great Smoky Mountains National Park in the Eastern District of Tennessee. The court discussing overlapping descriptions says:

"As to this portion of the McCulley grant, the Court is of the opinion that the McCulley title was never perfected for reasons heretofore stated relative to that part of the McCulley grant lying east of Hannah Mountain. But if for some reason not presently apparent it was perfected, it was lost by the McCulleys and acquired by the Government by virtue of the condemnation decree and seven years of subsequent adverse possession."

In 71 A.L.R.2d 418, Section 8, this language occurs:

"In a number of cases where a railroad, and in two instances where a school board of district, entered land pursuant to a condemnation judgment, or proceeding, it has been held that such judgment or proceeding, even though invalid, operated as color of title upon which title by adverse possession could be claimed."

It is true that the plaintiff did not set up its claim to title by adverse possession under color of title in its complaint. However, it did state, in paragraph three, that the United States of America is the owner of Tract No. 238–I. Generally speaking, a claim of title by adverse possession must be pleaded under North Carolina law. However, this applies only when adverse possession is set up as a defense to an action.

It does not apply when a claim of title is based upon adverse possession under color of title. McIntosh, North Carolina Practice and Procedure, states at Page 131: "In possessory actions which involve title to land, it is not necessary to plead the statute specially, * * * since the statute in such cases confers a title, and does not simply bar the remedy." (1929 Edition).

I therefore conclude that the condemnation proceeding in the District Court for the Western District of North Carolina At Law No. 311, under which plaintiff claims title, complied with Title 40 U.S.C.A. §§ 257 and 258, and General Statutes of North Carolina, Section 40–14, and was sufficient to give notice to all unknown claimants of any interest in the tracts of land described therein.

That this condemnation proceeding is a proceeding *in rem* and as such vested title to Tract No. 238–I in the plaintiff; and this title was not impaired by the fact that the heirs of William P. Head were not made parties by name and given actual notice of the proceeding.

That this decree in condemnation was color of title, and the adverse possession of the United States of America under this decree of condemnation under known and visible boundaries for a period of seven (7) years as required by General Statutes of North Carolina, § 1–38 was sufficient to cure any defects in the title conveyed by the decree of condemnation.

That the plaintiff recover judgment against the defendants in the sum of $500 as damages for the cutting and removing of timber from Tracts 505 and 238–I in accordance with the verdict of the jury.

That the costs of this action be taxed against the defendants.

Counsel will submit decree.